# Exhibit 1

**From the Office of the Minister**
Ministry of Justice & Constitutional Affairs
61 Constant Spring Road, Kingston 10, Jamaica
Tel: 876.906.4923-31
Website: www.moj.gov.jm Email: ministers.office@moj.gov.jm

REPLY OR SUBSEQUENT REFERENCE TO THIS COMMUNICATION SHOULD BE MADE TO THE OFFICE OF THE HONOURABLE MINISTER OF JUSTICE AND THE FOLLOWING REFERENCE QUOTED

December 5, 2025

United States Department of Justice
Criminal Division
Office of International Affairs
Washington, D.C.
United States of America
20530

**Attention: Mr Vaughn A. Ary- Director**

**RE: <u>URGENT Request to the United States of America for the Provisional Arrest of Oneil Joel Mitchell, a/k/a Oiley</u>**

Dear Sirs:

1. The Minister of Justice of Jamaica and Constitutional Affairs presents his compliments to the United States Department of Justice and has the honour to request the provisional arrest of Oneil Joel MITCHELL, a/k/a "Oiley," This provisional arrest request is submitted pursuant to the Extradition Treaty between the United States of America and the Government of Jamaica, which was signed on June 14, 1983 and entered into force on July 7, 1991 ("the Treaty"). Provisional arrest is covered by Article 10 of the Treaty. This request is urgent because MITCHELL has been located in Florida, United States of America and is currently in custody after being stopped by law enforcement for a speeding violation during which marijuana was found in his possession. Law enforcement also confirmed the existence of an active INTERPOL warrant in the system. MITCHELL may be released from custody imminently and is believed to be a flight risk who may seek to flee the jurisdiction.

2. MITCHELL is wanted to stand trial in Jamaica in the parish of Clarendon for the offence of Murder. On the 10th day of June, 2025, a Warrant on Information for the arrest of Oniel Joel MITCHELL, together with the Information sworn by Detective Corporal Damian Morgan, was issued by Mr. Andre Pasley, Justice of the Peace for the parish of Clarendon, for the offence of Murder contrary to common law. The Warrant on Information signed by the Justice of the Peace is hereto attached as **Exhibit 1**, and the criminal complaint for MITCHELL is hereto attached as **Exhibit 2**. The Information states that on May 27, 2025, in the parish of Clarendon, MITCHELL did murder Derricka Rodgers. Murder is an extraditable offence under Jamaican law and is punishable by death or life imprisonment with a mandatory minimum of fifteen years. Under Jamaican law the prosecution must prove beyond a

   reasonable doubt that the deceased is dead, that the accused killed her, and that the killing was without lawful justification.

3. The facts of the case are that on May 27, 2025, the deceased left her cousin's home around 10:15 a.m., stating that she was going to meet MITCHELL, her boyfriend, in May Pen to collect money. She did not return home and calls to her phone went unanswered. The deceased's father along with other family members listened to a voice note sent by the deceased to her mother on May 27, 2025. The information from the voice note prompted her family to launch a search for her in the area that the accused was residing temporarily.

4. She was reported missing on May 28, 2025. On June 1, 2025, they went to premises in Deeside District, Milk River, Clarendon, occupied by MITCHELL. During the search they found a sewage pit that appeared freshly sealed with concrete. After removing the cover, a foul scent was detected and police were summoned. A body wrapped in sheets, a garbage bag, and a comforter were recovered.

.../3

A backpack found in the pit contained identification documents belonging to Derricka Rodgers. Her father identified

the body based on a necklace with a pendant bearing the letter "D." The body was later pronounced dead at the May Pen Hospital.

5. A DVR System was retrieved from the house where the deceased's body was found which captured the period between May 27, 2025 and June 1, 2025. The DVR was submitted to the Communication Forensics and Cybercrime Division (CFCD) for analysis. Analysis of the DVR footage showed an individual later identified as MITCHELL, removing the concrete cover from the sewage pit, parking a vehicle beside the open hole, placing items into the opening, and resealing it. On July 1, 2025, Miss Michelle Barrett, the mother of Oniel Mitchell was interviewed. During the interview, she was shown printed pictures of Oniel Mitchell that were taken from the DVR installed at the premises where the deceased's body was found. Ms. Barrett viewed, identified and signed the pictures hereto attached as **Exhibit 3.** Mr. Clement Johnson, who has known MITCHELL for approximately five years and who transported him to and from the airport during his visits to Jamaica was also shown **Exhibit 3**. Johnson viewed and identified the photographs as depicting MITCHELL.

6. On September 26, 2025, Michelle Barrett, mother of MITCHELL, also viewed a photograph, hereto attached as **Exhibit 4** and identified the photograph as depicting her son Oneil Mitchell.

7. Pertinent descriptive information for MITCHELL is as follows:

| | |
|---|---|
| Alias: | Oiley |
| Citizenship: | Jamaica |
| Place of birth: | Jamaica |
| Listed Date of Birth: | November 2, 1996 |
| Race/Sex: | Black/Male |
| Build: | Stout |
| Complexion: | Dark |
| Location: | Florida, United States of America |

8. Information from the Passport, Immigration and Citizenship Agency indicates that MITCHELL departed Jamaica for the United States on May 29, 2025. On June 21, 2025, a post-mortem examination was conducted and the cause of death is pending. Samples were taken from the deceased, and several persons were interviewed and swabbed. Search warrants were executed but nothing evidentiary was found.

9. The Crown intends to rely on the statements of Clement Johnson, Everold Alex Morris, Dana Scarlett, Hugh Clive Watkis, Sheryll Spencer, Kemar Brown, and Sergeant Georgia Brown. These statements confirm the deceased's last movements, her communication with relatives, MITCHELL'S access to the premises, the discovery of the body, MITCHELL'S conduct and statements, his departure from Jamaica, and the identification of MITCHELL through **Exhibit 3, and Exhibit 4.**

10. The offence with which MITCHELL is charged is covered by Article 2 of the Treaty. In addition, there is no statute of limitations in Jamaica for the offence of Murder. Information from the National Intelligence Bureau indicates that the fugitive is believed to be residing at 4871 North West 7th Street, Plantation, Florida 33317, and intelligence indicates that he is planning to relocate.

11. Pursuant to Article 16 of the Treaty, Jamaica also requests the seizure of all articles, instruments, electronics, objects of value, or documents in MITCHELL's possession at the time of his arrest that may

relate to the offence for which extradition is sought, for later delivery to the Jamaica authorities upon granting of extradition.

12. Please be assured that if MITCHELL is arrested at the request of Jamaica, Jamaica will provide the supporting documents required by the Treaty within the time specified by the Treaty for extradition.

Sincerely,

Delroy Chuck

Delroy Chuck, KC, MP
**Minister**

Enclosures:

**Exhibit 1:** Copy of Warrant on Information for ONIEL JOEL MITCHELL
**Exhibit 2:** Copy of Criminal Complaint / Information for ONIEL JOEL MITCHELL
**Exhibit 3:** Photographs of ONIEL JOEL MITCHELL identified by Michelle Barrett and Clement Johnson
**Exhibit 4:** Photograph of ONIEL JOEL MITCHELL identified by Michelle Barrett

Exhibit 1

**PETTY SESSIONS – (Form G)** **Warrant on Information**

**JAMAICA SS.**

| | | |
|---|---|---|
| Parish of | **Clarendon** | |
| To the Constables of the | **J.C.F** | and to all other Peace |
| Officers in the Parish of | **Clarendon** | |

Whereas information hath this day been laid before the undersigned, one of his Majesty's Justices Of the Peace in and for the said parish of **Clarendon**

For that **Oneil Mitchell o/c "Oily"** of the said parish, to wit, on the **10th** day of **June** in the year of our Lord **Two Thousand and Twenty Five**

At the said parish and within my jurisdiction

Did unlawfully kill **Derricka Rodgers** contrary to common law

On oath being now made before me, substantiating the matter of such information.

THESE are therefore to command you in his Majesty's name, forthwith to apprehend the said and to bring him before some one or more of his Majesty's Justices of the Peace in and for the said parish to answer to the information and be further dealt with according to Law.

Given under my hand this **10th** day of **June** in the year of our Lord Two **Thousand and Twenty Five** in the parish of **Clarendon for the aforesaid Oneil Mitchell o/c "Oily"**

[signature]

10/6/2025

In the May Pen Parish Court of **Clarendon**

**Petty Sessions**

| | |
|---|---|
| **REX**<br>Vs<br>**Oneil Mitchell o/c "Oily"** | Warrant to apprehend |

**For Murder**

Exhibit 2



# INFORMATION

Parish of Clarendon

The information and Complaint of **#9457 Det. Cpl. Damian Morgan**

Of the Parish of Clarendon made and taken upon oath before the

Undersigned this 10th day of June the year of Our Lord Two

Thousand and Twenty Five who saith that on **Tuesday**

The **27th** day of **May** in the year **2025**

Aforesaid one **Oneil Mitchell o/c "Oily"** of the said Parish

Of Clarendon with force **committed at Deeside District Milk River Clarendon**

And within the jurisdiction

**Did Murder Derricka Rodgers**

**CONTRARY TO COMMON-LAW**

Against the form and the Statute in such case made and provided and against the Peace of Our

Sovereign King and his crown and Dignity, and there upon the said Complainant prays

That the said Oneil **Mitchell o/c** "Oily" Defendant may be made to answer upon the said Complaint according to law.

Taken and sworn to before me at May Pen

In the Parish of Clarendon this 10 day of June

Two Thousand and Twenty Five

.....................................................

*Justice of the Peace or Clerk of the Courts*
*For the Parish of*

10/6/2025

In the Parish of CLARENDON

REX

vs.

**Oneil Mitchell o/c "Oily"**

Information of Morgan Damian Det Cpl

**MURDER**

In the Parish of

REGINA

vs.

Information of

*

For

Tried on

Before

Guilty

Sentence

*here fill in place at which Court was held

Exhibit 3




This is A True photograph of
ONIEL Mitchell O/c. Oily
Clement Johnson
10/06/25

Exhibit 4



**MITCHELL Oniel**

**Control No.:** A-8733/6-2025

INTERPOL
RED NOTICE

**Requesting country:** Jamaica
**File No.:** 2025/43505
**Date of publication:** 18 June 2025
**Updated on:** 18 June 2025

## FUGITIVE WANTED FOR PROSECUTION

**CAUTION: Armed, Dangerous, Escape Risk, Violent**

Circulation to the media (including Internet) of the extract of the notice as published on INTERPOL's public website: No

## 1. IDENTITY PARTICULARS



**Family name:** MITCHELL
**Forename(s):** Oniel
**Family name in the original script or Chinese Telegraphic Code:** Mitchell
**Forename(s) in the original script or Chinese Telegraphic Code:** Oniel
**Sex:** Male
**Date and place of birth:** 2 November 1996 - St. Catherine - Jamaica
**Nationality:** Jamaica (confirmed)

### Also known as

| | Type | Family name | Forename | Date of birth | Place | Country |
|---|---|---|---|---|---|---|
| 1. | Alias | MITCHELL | Hopeton | 2 November 1996 | Clarendon | Jamaica |

**Nickname:** OILLY, ONEIL MITCHELL
**Family name at birth:** MITCHELL
**Marital status:** Married
**Mother's maiden name and forenames:** BARRETT Michelle
**Occupation:** Fork Lift Operator

**Languages spoken:** English
**Regions/Countries likely to be visited:** United States (Fort Lauderdale)

**Additional information:**
resides at 4871 North West 7th Street Planatation Florida ZIP 33317

### Identity documents

| | Nationality | Type | Number | Date of issue | Expiry date | Place | Country |
|---|---|---|---|---|---|---|---|
| 1. | Jamaica | Passport | A6527861 | 3 December 2019 | 2 December 2029 | Kingston | Jamaica |

### Addresses

| | Street | City/Town | Country |
|---|---|---|---|
| 1. | Milk River Rest District | Clarendon | |
| 2. | Invemess Drive, May Pen | Clarendon | Jamaica |

## 2. CASE

**Facts of the case**

| Town | Country | Date |
|---|---|---|
| Clarendon | Jamaica | From 27 May 2025 to 1 June 2025 |

**Summary of facts of the case**

Did unlawfully kill a humanbeing contrary to common law

## FUGITIVE WANTED FOR PROSECUTION

### ARREST WARRANT OR JUDICIAL DECISION 1/1

**Charge(s):** Murder

**Law covering the offence(s):** Offences Against the Person Act

**Maximum penalty possible:** Life imprisonment

**Time limit for prosecution or expiry date of arrest warrant:** No time-limit

**Arrest warrant or judicial decision having the same effect**

| Number | Date of issue | Issued or handed down by | Country |
|---|---|---|---|
| 10/06/2025 | 10 June 2025 | Justice of the Peace | Jamaica |

**Name of signatory:** A.PASLEY

Copy of arrest warrant available at the General Secretariat in the language used by the requesting country: Yes

## 3. ACTION TO BE TAKEN IF TRACED

### LOCATE AND ARREST WITH A VIEW TO EXTRADITION:

Assurances are given that extradition will be sought upon arrest of the person, in conformity with national laws and/or the applicable bilateral and multilateral treaties.

### PROVISIONAL ARREST:

This request is to be treated as a formal request for provisional arrest, in conformity with national laws and/or the applicable bilateral and multilateral treaties.

Immediately inform NCB KINGSTON Jamaica (NCB reference: RN/07/2025 of 12 June 2025) and the ICPO-INTERPOL General Secretariat that the fugitive has been found.

THE

# JAMAICA GAZETTE

## EXTRAORDINARY

65

Vol. CXVIII THURSDAY, FEBRUARY 2, 1995 No. 11

The following Notifications are, by command of His Excellency the Governor-General, published for general information.

GEOFF MADDEN,
Governor-General's Secretary.

## GOVERNMENT NOTICES

### MISCELLANEOUS

No. 124

### EXTRADITION TREATY BETWEEN THE GOVERNMENT OF JAMAICA AND THE GOVERNMENT OF THE UNITED STATES OF AMERICA

The Government of Jamaica and the Government of the United States of America;

Recalling the Treaty for the Mutual Extradition of Criminals between the United Kingdom and the United States of America concluded in London in 1931;

Noting that both the Government of Jamaica and the Government of the United States of America have continued to apply the terms of that Treaty; and

Desiring to provide for more effective cooperation between the two States in the suppression of crime and, for that purpose, to conclude a new treaty for the extradition of offenders;

Have agreed as follows:

ARTICLE I

*Obligation to Extradite*

1. The Contracting Parties agree to extradite to each other, subject to the provisions of this Treaty:

(a) persons whom the competent authorities in the Requesting State have charged with an extraditable offence committed within its territory; or

(b) persons who have been convicted in the Requesting State of such an offence and are unlawfully at large.

2. With respect to an offence committed outside the territory of the Requesting State, the Requested State shall grant extradition, subject to the provisions of this Treaty, if there is jurisdiction under the laws of both States for the punishment of such an offence in corresponding circumstances.

ARTICLE II

*Extraditable Offences*

1. An offence shall be an extraditable offence if it is punishable under the laws of both Contracting Parties by imprisonment or other form of detention for a period of more than one year or by any greater punishment.

2. The following offences shall be extraditable if they meet the requirements of paragraph (1)—

(a) conspiring in, attempting to commit, aiding or abetting, assisting, counselling or procuring the commission of, or being an accessory before or after the fact to, an offence described in that paragraph; or

(b) impeding the apprehension or prosecution of a person charged with an offence described in that paragraph.

3. For the purposes of this Article, an offence shall be an extraditable offence—

(a) whether or not the laws of the Contracting Parties place the offence within the same category of offences or denominate the offence by the same terminology; or

(b) whether or not the offence is one for which United States federal law requires proof of interstate transportation, or use of the mails or of other facilities affecting interstate or foreign commerce, such matters being merely for the purpose of establishing jurisdiction in a United States federal court.

ARTICLE III

*Political and Military Offences*

1. Extradition shall not be granted if the offence for which extradition is requested is of a political character.

2. Extradition shall also not be granted if:

(a) it is established that extradition is requested for political purposes; or

(b) it is established that the request for extradition, though purporting to be on account of the extraditable offence, is in fact made for the purpose of prosecuting or punishing the person sought on account of his race, religion, nationality, or political opinions; or

(c) the person sought is by reason of his race, religion, nationality, or political opinions, likely to be denied a fair trial or punished, detained or restricted in his personal liberty for such reasons.

3. It shall be the responsibility of the competent authorities of the Requested State to decide any question arising under paragraph (1). However, it shall be the responsibility of the executive authority of the Requested State to decide any question arising under paragraph (2) or (5) except to the extent that the national laws of that State expressly grant such powers to its courts.

4. Paragraphs (1) and (2) shall not apply to an offence which is extraditable pursuant to a treaty or convention to which both Contracting Parties are parties, the purpose of which is to prevent or repress a specific category of offences, and which imposes on States an obligation either to extradite the person sought or submit the matter to the competent authorities for decision as to prosecution.

5. Extradition may be refused for offences under military law which are not offences under ordinary criminal law.

ARTICLE IV

*Effect of Decision Not to Prosecute*

Extradition shall not be precluded by the fact that the competent authorities in the Requested State have decided not to prosecute the person sought for the acts for which extradition is requested or have decided to discontinue any criminal proceedings which have been initiated against the person sought.

ARTICLE V.

*Capital Punishment*

1. When the offence for which extradition is requested is punishable by death under the laws of the Requesting State, and the laws of the Requested State do not permit such punishment for that offence, the executive authority of the Requested State may refuse to grant extradition.

2. In exercising its discretion pursuant to paragraph (1), the executive authority of the Requested State shall give due and sympathetic consideration to any assurance given by the Requesting State, insofar as the laws of the Requesting State permit, that the death penalty will not be carried out.

ARTICLE VI

*Lapse of Time*

Extradition shall not be granted when prosecution of the offence for which extradition has been sought, or enforcement of the penalty for such an offence, has become barred by lapse of time according to the laws in the Requesting State.

ARTICLE VII

*Nationality*

1. Neither Contracting Party shall be bound to deliver up its own nationals but the executive authority of the Requested State shall, if not prevented by the laws of that State, have the power to deliver them up, if in its discretion, it be deemed proper to do so.

2. Extradition shall not be refused on the ground that the fugitive is a national of the Requested State if the fugitive is also a national of the Requesting State.

3. If extradition is not granted for an offence pursuant to paragraph (1), the Requested State shall, if it has jurisdiction over the offence, submit the case to its highest competent authorities for decision as to prosecution, in accordance with the law of that State.

ARTICLE VIII

*Extradition Procedures and Required Documents*

1. The request for extradition shall be made through the diplomatic channel.

2. The request for extradition shall be supported by:

(a) documents, statements, or other evidence which describe the identity and probable location of the person sought;

(b) a statement of the facts of the case, including, if possible, the time and location of the offence;

(c) a statement of the provisions of the law describing the essential elements and the designation of the offence for which extradition is requested;

(d) a statement of the provisions of the law prescribing the punishment for the offence; and

(e) a statement of the provisions of the law prescribing any time limit on the prosecution or the execution of punishment for the offence.

3. A request for extradition relating to a person who is sought for prosecution shall also be supported by:

(a) a copy of the warrant of arrest issued by a judge or other judicial authority in the Requesting State; and

(b) such evidence as would justify the committal for trial of that person if the offence had been committed in the Requested State.

4. When the request for extradition relates to a convicted person, in addition to those items required by paragraph (2), it shall be supported by a certificate of conviction or copy of the judgment of conviction rendered by a court in the Requesting State. If the person has been convicted and sentenced, the request for extradition shall also be supported by a statement showing to what extent the sentence has been carried out. If the person has been convicted but not sentenced, the request for extradition shall also be supported by a statement to that effect.

5. Statements, depositions and other documents transmitted in support of the request for extradition shall be transmitted through the diplomatic channel and shall be admissible if certified or authenticated in such manner as may be required by the law of the Requested State.

ARTICLE IX

*Additional Information*

1. If the executive authority of the Requested State considers that the information furnished in support of the request for extradition is not sufficient to fulfill the requirements of this Treaty, it shall notify the Requesting State in order to enable that State to furnish additional information before the request is submitted to a court of the Requested State.

2. The executive authority may fix a time limit for such information to be furnished.

3. Nothing in paragraph (1) or (2) shall prevent the executive authority of the Requested State from presenting to a court of that State information sought or obtained after submission of the request to the court or after expiration of the time stipulated pursuant to paragraph (2).

ARTICLE X

*Provisional Arrest*

1. In case of urgency either Contracting Party may request the provisional arrest in accordance with the law of the Requested State of any accused or convicted person pending the request for extradition. Application for provisional arrest shall be made through the diplomatic channel or directly between the Minister responsible for extradition in Jamaica and the Department of Justice in the United States of America.

2. The application shall contain:

(a) a description of the person sought;

(b) the location of that person if known;

(c) such information as would be necessary to justify the issuance of a warrant of arrest had the offence been committed, or the person sought been convicted, in the territory of the Requested State; and

(d) a statement that a request for extradition of the person sought will follow.

3. On receipt of such an application, the Requested State shall take the appropriate steps to secure the arrest of the person sought. The Requesting State shall be promptly notified of the result of its application.

4. A person who is provisionally arrested shall be discharged from custody upon the expiration of sixty (60) days from the date of arrest pursuant to the application for provisional arrest if the executive authority of the Requested State has not received the formal request for extradition and the supporting documents required by Article VIII.

5. The fact that a person is discharged from custody pursuant to paragraph (4) shall not prejudice the extradition of that person if the extradition request and the supporting documents mentioned in Article VIII are delivered at a later date.

## ARTICLE XI

*Decision and Surrender*

1. The Requested State shall promptly communicate through the diplomatic channel to the Requesting State its decision on the request for extradition.

2. If the request for extradition is denied by reason of any statutory or treaty prohibition against extradition, the Requested State shall provide such information as may be available as to the reason for the denial.

3. If the extradition is granted, the competent authorities of the Contracting Parties shall agree on the time and place of the surrender of the person sought.

4. If the person sought is not removed from the territory of the Requested State within the time prescribed by the law of that State, that person may be discharged from custody and the Requested State may subsequently refuse extradition for the same offence.

## ARTICLE XII

*Deferred Surrender*

If the extradition request is granted in the case of a person who is being prosecuted or is serving a sentence in the territory of the Requested State for a different offence, the Requested State shall, unless its laws otherwise provide, defer the surrender of the person sought until the conclusion of the proceedings against that person or the full execution of any punishment that may be or may have been imposed.

## ARTICLE XIII

*Requests for Extradition Made by Several States*

The executive authority of the Requested State, upon receiving requests from the other Contracting Party and from any other state or States for the extradition of the same person, either for the same offence or for different offences, shall determine to which State it will extradite that person.

## ARTICLE XIV

*Rule of Speciality*

1. A person extradited under this Treaty may only be detained, tried or punished in the Requesting State, for the offence for which extradition is granted, or—

(a) for a lesser offence proved by the facts before the court of committal, or in the case of extradition pursuant to Article XV, any lesser offence disclosed by the facts upon which the request is based; or

(b) for an offence committed after the extradition; or

(c) for an offence in respect of which the executive authority of the Requested State, in accordance with its laws, consents to the person's detention, trial or punishment; and for the purposes of this sub-paragraph the Requested State may require the submission of documents mentioned in Article VIII or the written views of the extradited person with respect to the offence concerned, or both; or

(d) If the person—

(i) having left the territory of the Requesting State after his extradition, voluntarily returns to it; or

(ii) being free to leave the territory of the Requesting State after his extradition, does not so leave within forty-five (45) days after the first day on which he was free to do so.

2. A person extradited under this Treaty may not be extradited to a third State unless—

(a) the Requested State consents; or

(b) the circumstances are such that he could have been dealt with in the Requesting State pursuant to sub-paragraph (d) of paragraph (1).

Case 0:26-mc-60822-UNA Document 1-2 Entered on FLSD Docket 03/20/2026 Page 17 of 46



ARTICLE XV

*Simplified Extradition*

If the person sought agrees in writing to extradition after personally being advised by a Judge or competent Magistrate of his right to further extradition proceedings, the Requested State may grant extradition without formal proceedings. Extradition pursuant to this Article shall be subject to Article XIV.

ARTICLE XVI

*Seizure and Surrender of Property*

1. To the extent permitted under the laws in the Requested State all articles, instruments, objects of value, documents or other evidence relating to the offence may be seized and such items may be surrendered upon the granting of the extradition. The items mentioned in this Article may be surrendered even when extradition cannot be effected due to the death, disappearance, or escape of the person sought.

2. The rights of third parties in such property shall be duly respected.

3. The Requested State may impose conditions designed to ensure that the rights of third parties are protected and that the property is returned to the Requested State as soon as practicable.

ARTICLE XVII

*Expenses and Representation*

1. Expenses related to the transportation of the person sought to the Requesting State shall be paid by that State. All other expenses relating to the apprehension of the person sought and to subsequent proceedings shall be borne by the Requested State. However, expenses which, in the opinion of the Parties, constitute special expenditures shall be borne by the Requesting State.

2. The Requested State shall also provide for the representation of the Requesting State in any proceedings arising in the Requested State out of a request for extradition.

3. No pecuniary claim arising out of the arrest, detention, examination and surrender of the person sought under the terms of this Treaty shall be made by the Requested State against the Requesting State.

4. Paragraph (3) shall not apply to claims arising out of failure of the Requesting State to comply with conditions imposed pursuant to paragraph (3) of Article XVI.

ARTICLE XVIII

*Scope of Application*

This Treaty shall apply to offences encompassed by Article II committed before as well as after the date this Treaty enters into force if at the time of the Act or omission comprising the offence such act or omission constituted an offence under the laws of both States.

ARTICLE XIX

*Ratification and Entry into Force*

1. This Treaty shall be subject to ratification; the instruments of ratification shall be exchanged at Washington as soon as possible.

2. This Treaty shall enter into force thirty (30) days after the exchange of the instruments of ratification.

3. Upon entry into force of this Treaty, the Extradition Treaty between the United States of America and the United Kingdom signed at London, December 22, 1931, shall cease to have effect between Jamaica and the United States of America. Nevertheless, the 1931 Treaty shall continue to have effect in relation to any request for extradition made before this Treaty enters into force.

ARTICLE XX

*Termination*

1. Either Contracting Party may terminate this Treaty at any time by giving written notice to the other Party, and the termination shall be effective six (6) months after the date of receipt of such notice.

2. Nothing in paragraph (1) shall affect any request of an extradition made before the date on which the termination becomes effective.

IN WITNESS WHEREOF, the undersigned, being duly authorized by their respective Governments, have signed this Treaty.

DONE AT KINGSTON, in duplicate, this 14th day of June, 1983.

| For the Government of Jamaica | For the Government of the United States of America |
|---|---|
| WINSTON SPAULDING, Minister of National Security and Justice. | WILLIAM A. HEWITT, Ambassador of the United States of America. |

No. CF 140/II Vol. V

---

No. 125

## INSTRUMENT OF RATIFICATION

WHEREAS the Extradition Treaty between the Government of the United States of America and the Government of Jamaica was signed on behalf of both Governments on the 14th day of June, 1983.

AND WHEREAS Article 19 of the said Treaty provides that the said Treaty shall be by ratification.

NOW THEREFORE the undersigned Minister of Justice, on behalf of the Government of Jamaica, hereby ratifies that Extradition Treaty between the United States of America and Jamaica.

R. C. RATTRAY,
Minister of Justice.

Done this 31st day of May, 1991 at Kingston, Jamaica.

I, Deta Cheddar, hereby certify that this a true copy of the Original Instrument of Ratification of the Extradition Treaty between the Government of Jamaica and the Government of the United States of America which was done on the 31st day of May, 1991 in Kingston, Jamaica.

DETA CHEDDAR, (MRS.)
Authenticating Officer,
Ministry of Foreign Affairs and Foreign Trade, Jamaica.

February 13, 1994.

No. CF 140/II Vol. V

---

No. 126

## EXTRACT FROM THE MINUTES OF THE HOUSE OF REPRESENTATIVES ON THE 15TH DAY OF AUGUST, 1991

### GOVERNMENT BUSINESS

The Minister of Justice moved:—

WHEREAS the Extradition Act, 1991, provides, in section 4 that where an extradition treaty has been made with any foreign State, the Minister may, by order, declare that the provisions of the Act shall apply in respect of such foreign State:

AND WHEREAS an Extradition Treaty has been made with the United States of America:

AND WHEREAS the Minister, by the Extradition (Foreign States) Order, 1991, has declared that the provisions of the Extradition Act, 1991 shall apply, in respect of the United States of America:

NOW, THEREFORE, BE IT RESOLVED by this Honourable House that the Extradition (Foreign States) Order, 1991, be affirmed.

### THE EXTRADITION ACT, 1991
(Act 7 of 1991)

THE EXTRADITION ACT, 1991 (APPOINTED DAY) NOTICE

In exercise of the power conferred upon the Minister by section 1 of the Extradition Act, 1991, the following Notice is hereby given:—

1. This Notice may be cited as the Extradition Act, 1991 (Appointed Day) Notice.

2. The eighth day of July, 1991, is hereby apointed as the day on which the Extradition Act, 1991 shall come into operation.

Dated this eleventh day of June, 1991.

(Mr. P. Rose-Green entered and took his seat).

(Mr. H. Dalley entered and took his seat).

(Mr. C. Marshall entered and took his seat).

Seconded by the Minister of Construction.

Agreed to.

I certify that the above is a true extract from the Minutes.

S. M. LEWIS,
Clerk to the Houses.

No. CF 140/11 Vol. V

---

No. 127

EXTRACT FROM THE MINUTES OF THE SENATE
ON THE 13TH DAY OF SEPTEMBER, 1991

GOVERNMENT BUSINESS

The Minister of Foreign Affairs and Foreign Trade having obtained suspension of the Standing Orders moved:—

WHEREAS the Extradition Act, 1991, provides, in section 4, that where an extradition treaty has been made with any foreign State, the Minister may, by order, declare that the provisions of the Act shall apply in respect of such foreign State:

AND WHEREAS an extradition treaty has been made with the United States of America:

AND WHEREAS the Minister, by the Extradition (Foreign States) Order, 1991, has declared that the provisions of the Extradition Act, 1991 shall apply in respect of the United States of America:

NOW, THEREFORE, BE IT RESOLVED by this Honourable Senate that the Extradition (Foreign States) Order, 1991, be affirmed.

THE EXTRADITION ACT, 1991
(Act 7 of 1991)

THE EXTRADITION ACT, 1991 (APPOINTED DAY) NOTICE

In exercise of the power conferred upon the Minister by section 1 of the Extradition Act, 1991, the following Notice is hereby given:—

1. This Notice may be cited as the Extradition Act, 1991 (Appointed Day) Notice.

2. The eighth day of July, 1991, is hereby appointed as the day on which the Extradition Act, 1991 shall come into operation.

Dated this eleventh day of June, 1991.

R. C. RATTRAY,
Minister of Justice.

Seconded by Senator Harding.

Agreed to.

I certify that the above is a true extract from the Minutes.

S. M. LEWIS,
Clerk of the Houses.

ANY REPLY OR SUBSEQUENT REFERENCE TO THIS COMMUNICATION SHOULD BE ADDRESSED TO THE DIRECTOR OF PUBLIC PROSECUTIONS AND **NOT TO ANY OFFICER BY NAME** AND THE FOLLOWING REFERENCE QUOTED:-

TELEPHONE: 922-6321-5
TELE. FAX: (876) 922-4318

**OFFICE OF THE DIRECTOR OF PUBLIC PROSECUTIONS**

P.O. BOX 633,

KINGSTON,

JAMAICA

File No. C686

December 9, 2025

United States Department of Justice
Criminal Division
Office of International Affairs
Washington, D.C.
Unites States of America

**Attention: Philip Mervis – Trial Attorney**

Dear Sir,

**Re: Request to the United States of America for the Provisional Arrest of Oniel Joel Mitchell aka Oiley**

Please be advised that the Warrant on Information which was submitted with the Provisional request is valid and executable upon the subject based on Jamaican Law. The Government of Jamaica undertakes to, at the time of the formal request for extradition, to provide a corrected Warrant on Information.

**CONTEXT & HISTORY OF VIOLENCE**

***Voice Note of May 26, 2025***

Dana Scarlett also stated that on May 26, 2025, the deceased sent her a voice note saying *"little most unu plan funeral fe me to bloodclaat"* then called her via Whats App and told her that the **deceased had put a gun at her head, squeezed the trigger and the gun made a click sound.** She added that the deceased stated in the voice note that Oniel Mitchell **used words to threaten her.** Dana Scarlett asked the deceased to send her a picture of Oniel Mitchell and the deceased sent her the photo.

***Voice Note to Mother & Family Response***

On May 27, 2025, the deceased's cousin Kevin Badley was unsuccessful in contacting the deceased by phone. He made enquiries with the father of the deceased who also could not reach the deceased by phone. On May 28, 2025, the deceased's mother sent Badley a voice note that she indicated that she received from the deceased on May 27, 2025. Badley listened to the voice note. The voice note purports to be that of the deceased saying:

*"I wasn't supposed to go to work today but somebody is supposed to come collect a token at the shop so I going to work for half day. I am here with Oiley now. Me actually reach Milk River now."*

Kevin Badley, still not being able to reach the deceased, contacted the subject Mitchell by phone. The subject told Badley that he had not seen the deceased since May 27, 2025 at about 12:00 pm.

Badley then contacted a friend of the deceased Miss Abby-Gay Mullings, who also could not locate the deceased. Badley then shared the voice note he received from the deceased's mother with Mullings. Ms. Mullings contacted the subject Mitchell and enquired whether he had seen the deceased. Mitchell told Mullings that he had not seen the deceased since May 27, 2025. Mullings then told Mitchell that the deceased had not gone home since the deceased met with him on May 27, 2025. To this Mitchell responded - "*maybe she gone to her next man.*" Mullings then told Mitchell that she knew the deceased met with him because the deceased sent a voice note to her mother indicating that she met with him in May Pen (Clarendon). Mitchell then responded by saying that he didn't know about that as from he met with the deceased and gave her money, the deceased indicated to him that she was going back to work.

Based on this information, Mullings called the deceased's employer who advised her that the deceased was instructed not to come to work on May 27, 2025 because he (the employer) would not be present. Thereafter, based on the information and sequence of events, both Mullings and Badley went to the police station where a missing report was made in respect of the deceased. After the report was made, Mullings called the Subject and enquired where was the deceased and Mitchell said he did not know. On the following day May 29, 2025, Mullings, Badley, the father of the deceased and the police launched a search for the deceased.

**MITCHELL'S CONNECTION TO THE PREMISES**

The deceased's body was found in a sewage pit which is connected to a dwelling house in a residential community in the parish of Clarendon on May 29, 2025. Hugh Clive Watkis is the caretaker and cousin of the owner of this premises. He stated that Oniel Mitchell had access to the premises and would stay there when he visited Jamaica. **He also said that Mitchell was the only person who stayed at the premises when he was in Jamaica. Watkis further stated that up to June 2025, Mitchell had been living at the premises for one year** and that Mitchell had a key to the premises.

**Digital Video Recorder (DVR)/ Closed Circuit Television (CCTV) FOOTAGE**

The said premises where the deceased's body was found and which the subject was residing and had access to, was outfitted with a Digital Video Recorder (DVR)/ Closed Circuit Television (CCTV) system which captured the exterior of the premises including the sewage pit where the deceased's body was found. It is from this DVR/CCTV system that footage was extracted showing the subject Mitchell removing the cover from the sewage pit and placing what appeared to be a body wrapped in a sheet and a garbage bag inside the pit on May 27, 2025. The footage then showed the subject resealing the sewage pit. `

**DISCOVERY OF THE BODY**

***Initial Observation at the Sewage Pit***

On May 29, 2025, during the search of the premises connected to the Subject, the father of the deceased and police personnel went to the sewage pit, noted a foul smell on the premises and observed that the sewage pit appeared to have been recently worked on. The sewage pit was opened and therein the partially decomposed body of the deceased, wrapped in a sheet and another black garbage bag were removed. The deceased's father states that he was shown the head and face of the deceased who he identified on the scene.

***Identification of Documents Found at the Scene***

The black garbage bag that was found in the sewage pit where the deceased's body was found contained, among other things, identification cards bearing the name **Derricka Rodgers**, a Taxpayer Registration Number (TRN) card, food handler's permit, and National Insurance Scheme (NIS) card, all bearing the name **Derricka Rodgers**. The father of deceased also a pair of Crocs shoes, handbag and clothing that he identified to belong to the deceased.

***Post-Mortem Identification***

On June 21, 2025, Derrick Rodgers went to Archer's Funeral Home for the post-mortem examination. He identified the partially decomposed body of the deceased to the Pathologist as that of his daughter **Derricka Rodgers**.

***Identification of Personal Items Found***

Mr. Derrick Rodgers also identified a gold chain and pendant that were around the deceased's neck. This gold chain was handed to Mr. Rodgers at the post-mortem. The body was subsequently released to him for funeral arrangements.

***Behaviour When Leaving the Island***

Sheryll Spence stated that on May 29, 2025, her ex-partner, Clement Johnson, parked Oniel Mitchell's vehicle at her house after he dropped Mitchell at the airport. Clement Johnson told her that **Mitchell looked nervous** while he was taking him to the airport.

***Statements Suggesting Flight or Avoidance***

Sheryll Spence said she spoke to him again that same night and told him that he needed to get a lawyer. He responded, ***"mi nuh have nuh time to get no lawyer right now, mi a look fi move from wey mi deh, when mi done mi wi tink bout dat deh part deh."***

Your extension of professional courtesies will be greatly appreciated.

I am yours truly,

KC
SDDPP

Jeremy Taylor BM(M), KC
Senior Deputy Director of Public Prosecutions
For Director of Public Prosecutions

***32. P.M.E. #*** 1623 ***/ 25***

# POST MORTEM EXAMINATION REPORT

I hereby report that on the **21st** **day of June 2025**
I viewed and examined the body of a **female** **deceased, Derricka RODGERS**
**at the Archer's Funeral Home** in the parish of **St Catherine**
and have noted the following particulars after careful enquiry and examination.

## PARTICULARS OF ENQUIRY

| | |
|---|---|
| a. When, where and by whom the body was discovered | The body was discovered on Sunday, June 1, 2025 about 1:00 pm at Deeside District, Milk River, Clarendon inside a sewage pit by citizens. |
| b. The position of the body when discovered and its surroundings | The body was found inside a sewage pit wrapped in grey sheet, black garbage bag and a comforter. |
| c. If the body had been moved the object thereof and by whom caused | On the instructions of the police, the body was removed to the Witter and Sons Company Limited to await postmortem examination. |
| d. The name, address, calling, sex, age, and colour of the deceased | Name: Derricka RODGERS<br>Address: Gravel Hill District, Milk River, Clarendon<br>Age: 20 years old; DOB: February 3, 2005<br>Gender: Female<br>Marital Status: Single<br>Occupation: Sales Representative |
| e. The name, calling and address of the persons identifying the body | Name: Derrick Rodgers<br>Relation to Deceased: Father<br>Address: Gravel Hill District, Clarendon<br>Occupation: Taxi Operator |
| f. Pathologist's Assistants / Morgue Attendants / Dieners | Ms K. Merchant, Mr D. Gaynor, Ms S. Prendergast |
| g. Investigating Police Officer(s) | Detective Corporal D. Morgan, no 9457 of Lionel Town Police Station |
| h. Scene of Crime Officer | Constable T. Brown, no 20296 |

**PARTICULARS OF THE EXAMINATION**

| | |
|---|---|
| a. The time and place of the examination and the number of hours after death | The postmortem examination was performed at the Archer's Funeral Home on June 21, 2025, 11:33 am, approximately 20 days after discovery. The scene was not visited. Rigor mortis is absent. Postmortem hypostasis is present on the right side of the body. There are putrefactive decompositional changes including extensive skin and hair slippage, marbling and bloating. |
| b. The result of the examination of the position of the clothing or coverings, and external appearances of the body with special reference to any marks of violence or injury | The body is presented to me wrapped in white plastic and in a black body bag with police seal, a black plastic, grey sheet and a green sheet. The body is unclad. Jewellery on the body: A gold-coloured necklace with pendant, four (4) gold-coloured knob earrings, a navel ring and a beaded anklet. Personal effects accompanying the body: None.<br>(The necklace and earrings are released to the police at the completion of the postmortem examination).<br>There is no evidence of recent therapy.<br>The body is that of a well-developed adult woman.<br>Height = 5 feet 5 inches; Waist = 30 inches.<br>Residual scalp hair is black and plaited. Natural dentition is present. The oral mucosa is uninjured and the irides are clouded. Conjunctivae decomposed.<br>The skin has no tattoos or other specific identifying features.<br>The external genitalia are unremarkable. |

c. Signs of recent injury (external and internal)

***COMMENTS:***

*i. Injuries are described in continuity with the body in anatomical position (upright, fontal with palms facing forward).*

*ii. The order in which the injuries are described is arbitrary and does not necessarily represent the order of occurrence.*

*iii. All injuries show a vital reaction and are recent unless stated otherwise.*

*iv. The body cavities, soft tissues and viscera show evidence of putrefactive decompositional changes. These changes may have modified the appearances of the body including injuries and will not be outlined further in the descriptions that follow.*

**HEAD**

1. An 8 x 5 cm contusion to the right cheek with underlying fractures of the right zygomatic arch and right side of the frontal bone.
2. Ill-defined contusion to the right temporal scalp with comminuted base of skull fractures involving the frontal, temporal, sphenoid, ethmoid bones.
3. Fracture of the left side of the occipital bone.

**The particulars that I have been able to ascertain by enquiry and external examination of the body being insufficient to enable me to determine for legal purposes the cause of death, I have made such dissections as were necessary and have observed and noted the following appearances:-**

**Derricka RODGERS**

| | |
|---|---|
| d. 1. The head, brain, spinal cord, organs of special senses, etc. | **Head, Neck and Central Nervous System**<br>See signs of recent injury.<br>The brain is liquefied and weighs 500 g.<br>The spinal cord has not been examined.<br>The soft tissues of the neck are unremarkable.<br>The hyoid bone, thyroid and cricoid cartilages are uninjured. The laryngeal mucosa and epiglottis are unremarkable.<br>The thyroid gland is unremarkable. |
| 2. The thorax and contents | The pleura and cavities are unremarkable.<br>The pericardium and cavity are unremarkable.<br>**Cardiovascular System**<br>The heart weighs 100 g.<br>It has the usual anatomic arrangement of chambers and great vessels.<br>The coronary arteries are widely patent. The right coronary artery is dominant. The atria, ventricles and cardiac valves are unremarkable.<br>The aorta is unremarkable. The inferior vena cava is unremarkable.<br>**Respiratory System**<br>The trachea and bronchi are patent and unremarkable.<br>The pulmonary arteries are unremarkable.<br>Right lung: 100 g; Left lung: 75 g.<br>No tumours or areas of consolidation are identified.<br>**Other Organs/Regions**<br>The oesophagus is unremarkable.<br>The mediastinum is unremarkable. |
| 3. The abdomen and contents | The peritoneum and cavity are unremarkable. The diaphragm is unremarkable.<br>**Digestive System**<br>The stomach contains approximately 500 ml of partially digested food.<br>The gastric mucosa is unremarkable.<br>The vermiform appendix is unremarkable.<br>The intestines are not obstructed or perforated.<br>The liver weighs 400 g.<br>It has an unremarkable, smooth capsular surface. Serial sections show unremarkable homogeneous liver parenchyma.<br>The gallbladder is unremarkable.<br>The pancreas is autolyzed.<br>The spleen weighs 50 g.<br>**Urinary system**<br>Right kidney: 50 g; Left kidney: 50 g.<br>The cortical surfaces are smooth. The cut surfaces are without evidence of abscess or tumour.<br>The urinary bladder is unremarkable and contains no urine. |
| 4. The extremities | The limbs are not dissected. |

| | |
|---|---|
| 5. Pelvis, genital organs, anus and other orifices | The uterus, fallopian tubes and ovaries are unremarkable.<br>The anus is unremarkable. |

Having reason to believe that death may have been caused or accelerated by poison, I have placed the following substances in two (2) containers which I have carefully stoppered, secured and handed to Constable T. Brown, no 20296 for transmission to Government Analyst at the Institute of Forensic Science and Legal Medicine.

a) Liver and kidney

b) Stomach and contents

The results of the analyses are in report FL No. 1182/2025.

a) No positive findings of toxicological significance.

**Exhibits**

A. Anal and vaginal swabs and a portion of sternum have been submitted for DNA analysis.

Exhibits collected by Scene of Crime Officer Constable T. Brown, no 20296 for transmission to the Institute of Forensic Science and Legal Medicine.

**Information obtained respecting the history and symptoms observed before death**

**ITEMS REVIEWED**

1. Forensic Institute Autopsy Requisition Form dated June 2, 2025.
2. Information from the Investigating Officer at the beginning of the postmortem examination.
3. Police Report dated June 1, 2025.

**HISTORY**

1. Ms Rodgers was last seen alive on May 20. 2025 by residents. She was reported missing to the police on May 27, 2025. On June 1, 2025 relatives went to a house where Oneil Mitchell, said to be her boyfriend, was staying. During a search of the premises they found a sewage pit at the front of the yard with fresh cement sealing it. The cement seal was removed and her body was found inside along with several documents in her name. The pit was about 12 feet deep.

**PROCEDURES**

1. The Scene of Crime Officer has obtained photographs of the postmortem examination.
2. A standard external examination was performed.
3. A standard internal examination was performed. Modified musculocutaneous dissection of the anterior torso and layered dissection of the neck were performed.

**SUMMARY OF OPINION AS TO CAUSE OF DEATH**

1. At autopsy the main findings were a partially decomposed woman with blunt impact trauma to the head inclusive of contusions and multiple separate skull fractures. The injuries caused traumatic brain injury and death of the deceased. At least three (3) points of impacts from different directions were necessary to have caused the injuries.

2. Due to the extent of decomposition subtle injuries may not have been identified.

3. No other injuries including defensive-type wounds were not identified.

4. No significant natural disease was found.

5. The cause of death is attributed to traumatic brain injury due to multiple blunt force trauma to the head.

All statements made in this Report should be to the personal knowledge of the Operator.

**Derricka RODGERS**

From the abovementioned information and appearances, I am of the opinion that: Cause of death is due to:

| Part I: Immediate cause of death and antecedent causes, if any, giving rise to the immediate cause (a); state the underlying cause last | |
|---|---|
| (a) | **TRAUMATIC BRAIN INJURY** |
| | DUE TO or as the consequence of |
| (b) | **MULTIPLE BLUNT FORCE TRAUMA TO THE HEAD** |

December 19, 2025

Dr Ransford Fearon, MBBS; MSc; DM (Path).
*Forensic Pathologist*, Department of Pathology,
Institute of Forensic Science and Legal Medicine
2 ½ Hope Boulevard, Kingston 6.
Telephone: 876-977-0229-33; Fax 876-977-0234

Date

INSTITUTE OF FORENSIC SCIENCE
AND LEGAL MEDICINE
PATHOLOGY DEPARTMENT
JAN 06 2026
2½ Hope Boulevard, Kingston 6

EXTRADITION TREATY BETWEEN THE GOVERNMENT OF THE UNITED STATES OF AMERICA AND THE GOVERNMENT OF JAMAICA

The Government of the United States of America and the Government of Jamaica,

Recalling the Treaty for the Mutual Extradition of Criminals between the United Kingdom and the United States of America concluded in London in 1931;

Noting that both the Government of the United States of America and the Government of Jamaica have continued to apply the terms of that Treaty; and

Desiring to provide for more effective cooperation between the two States in the suppression of crime and, for that purpose, to conclude a new treaty for the extradition of offenders;

Have agreed as follows:

ARTICLE I

*Obligation to Extradite*

(1) The Contracting Parties agree to extradite to each other, subject to the provisions of this Treaty:

(a) persons whom the competent authorities in the Requesting State have charged with an extraditable offense committed within its territory; or

(b) persons who have been convicted in the Requesting State of such an offence and are unlawfully at large.

(2) With respect to an offence committed outside the territory of the Requesting State, the Requested State shall grant extradition, subject to the provisions of this Treaty, if there is jurisdiction under the laws of both States for the punishment of such an offense in corresponding circumstances.

ARTICLE II

*Extraditable Offences*

(1) An offence shall be an extraditable offence if it is punishable under the laws of both Contracting Parties by imprisonment or other form of detention for a period of more than one year or by any greater punishment.

(2) The following offences shall be extraditable if they meet the requirements of paragraph (1):

(a) conspiring in, attempting to commit, aiding or abetting, assisting, counselling or procuring the commission of, or being an accessory before or after the fact to, an offence described in that paragraph; or

(b) impeding the apprehension or prosecution of a person charged with an offence described in that paragraph.

(3) For the purposes of this Article, an offence shall be an extraditable offence:

(a) whether or not the laws of the Contracting Parties place the offence within the same category of offences or denominate the offence by the same terminology; or

(b) whether or not the offence is one for which United States federal law requires proof of interstate transportation, or use of the mails or of other facilities affecting interstate or foreign commerce, such matters being merely for the purpose of establishing jurisdiction in a United States federal court.

ARTICLE III

*Political and Military Offences*

(1) Extradition shall not be granted if the offence for which extradition is requested is of a political character.

(2) Extradition shall also not be granted if:

(a) it is established that extradition is requested for political purposes; or

(b) it is established that the request for extradition, though purporting to be on account of the extraditable offence, is in fact made for the purpose of prosecuting or punishing the person sought on account of his race, religion, nationality, or political opinions; or

(c) the person sought is by reason of his race, religion, nationality, or political opinions, likely to be denied a fair trial or punished, detained or restricted in his personal liberty for such reasons.

(3) It shall be the responsibility of the competent authorities of the Requested State to decide any question arising under paragraph (1). However, it shall be the responsibility of the executive authority of the Requested State to decide any question arising under paragraph (2) or (5) except to the extent that the national laws of that State expressly grant such powers to its courts.

(4) Paragraphs (1) and (2) shall not apply to an offence which is extraditable pursuant to a treaty or convention to which both Contracting Parties are parties, the purpose of which is to prevent or repress a specific category of offences, and which imposes on States an obligation either to extradite the person sought or submit the matter to the competent authorities for decision as to prosecution.

(5) Extradition may be refused for offences under military law which are not offences under ordinary criminal law.

ARTICLE IV

*Effect of Decision Not to Prosecute*

Extradition shall not be precluded by the fact that the competent authorities in the Requested State have decided not to prosecute the person sought for the acts for which extradition is requested or have decided to discontinue any criminal proceedings which have been initiated against the person sought.

ARTICLE V

*Capital Punishment*

(1) When the offence for which extradition is requested is punishable by death under the laws of the Requesting State, and the laws of the Requested State do not permit such punishment for that offence, the executive authority of the Requested State may refuse to grant extradition.

(2) In exercising its discretion pursuant to paragraph (1), the executive authority of the Requested State shall give due and sympathetic consideration to any assurance given by the Requesting State, insofar as the laws of the Requesting State permit, that the death penalty will not be carried out.

ARTICLE VI

*Lapse of Time*

Extradition shall not be granted when prosecution of the offence for which extradition has been sought, or enforcement of the penalty for such an offence, has become barred by lapse of time according to the laws in the Requesting State.

ARTICLE VII

*Nationality*

(1) Neither Contracting Party shall be bound to deliver up its own nationals but the executive authority of the Requested State shall, if not prevented by the laws of that State, have the power to deliver them up if, in its discretion, it be deemed proper to do so.

(2) Extradition shall not be refused on the ground that the fugitive is a national of the Requested State if the fugitive is also a national of the Requesting State.

(3) If extradition is not granted for an offence pursuant to paragraph (1), the Requested State shall, if it has jurisdiction over the offence, submit the case to its highest competent authorities for decision as to prosecution, in according with the law of that State.

ARTICLE VIII

*Extradition Procedures and Required Documents*

(1) The request for extradition shall be made through the diplomatic channel.

(2) The request for extradition shall be supported by:

(a) documents, statements, or other evidence which describe the identity and probable location of the person sought;

(b) a statement of the facts of the case, including, if possible, the time and location of the offence;

(c) a statement of the provisions of the law describing the essential elements and the designation of the offence for which extradition is requested;

(d) a statement of the provisions of the law prescribing the punishment for the offence; and

(e) a statement of the provisions of the law prescribing any time limit on the prosecution or the execution of punishment for the offence.

(3) A request for extradition relating to a person who is sought for prosecution shall also be supported by:

(a) a copy of the warrant of arrest issued by a judge or other judicial authority in the Requesting State; and

(b) such evidence as would justify the committal for trial of that person if the offence had been committed in the Requested State.

(4) When the request for extradition relates to a convicted person, in addition to those items required by paragraph (2), it shall be supported by a certificate of conviction or copy of the judgment of conviction rendered by a court in the Requesting State. If the person has been convicted and sentenced, the request for extradition shall also be supported by a statement showing to what extent the sentence has been carried out. If the person has been convicted but not sentenced, the request for extradition shall also be supported by a statement to that effect.

(5) Statements, depositions and other documents transmitted in support of the request for extradition shall be transmitted through the diplomatic channel and shall be admissible if certified or authenticated in such manner as may be required by the law of the Requested State.

ARTICLE IX

*Additional Information*

(1) If the executive authority of the Requested State considers that the information furnished in support of the request for extradition is not sufficient to fulfill the requirements of this Treaty, it shall notify the Requesting State in order to enable that State to furnish additional information before the request is submitted to a court of the Requested State.

(2) The executive authority may fix a time limit for such information to be furnished.

(3) Nothing in paragraph (1) or (2) shall prevent the executive authority of the requested State from presenting to a court of that State information sought or obtained after submission of the request to the court or after expiration of the time stipulated pursuant to paragraph (2).

ARTICLE X

*Provisional Arrest*

(1) In case of urgency either Contracting Party may request the provisional arrest in accordance with the law of the Requested State of any accused or convicted person pending the request for extradition. Application for provisional arrest shall be made through the diplomatic channel or directly between the Department of Justice in the United States of America and the Minister responsible for extradition in Jamaica.

(2) The application shall contain:

(a) a description of the person sought;

(b) the location of that person if known;

(c) such information as would be necessary to justify the issuance of a warrant of arrest had the offence been committed, or the person sought been convicted, in the territory of the Requested State; and

(d) a statement that a request for extradition of the person sought will follow.

(3) On receipt of such an application, the Requested State shall take the appropriate steps to secure the arrest of the person sought. The Requesting State shall be promptly notified of the result of its application.

(4) A person who is provisionally arrested shall be discharged from custody upon the expiration of sixty (60) days from the date of arrest pursuant to the application for provisional arrest if the executive authority of the Requested State has not received the formal request for extradition and the supporting documents required by Article VIII.

(5) The fact that a person is discharged from custody pursuant to paragraph (4) shall not prejudice the extradition of that person if the extradition request and the supporting documents mentioned in Article VIII are delivered at a later date.

## ARTICLE XI

### *Decision and Surrender*

(1) The Requested State shall promptly communicate through the diplomatic channel to the Requesting State its decision on the request for extradition.

(2) If the request for extradition is denied by reason of any statutory or treaty prohibition against extradition, the Requested State shall provide such information as may be available as to the reason for the denial.

(3) If the extradition is granted, the competent authorities of the Contracting Parties shall agree on the time and place of the surrender of the person sought.

(4) If the person sought is not removed from the territory of the Requested State within the time prescribed by the law of that State, that person may be discharged from custody and the Requested State may subsequently refuse extradition for the same offence.

## ARTICLE XII

### *Deferred Surrender*

If the extradition request is granted in the case of a person who is being prosecuted or is serving a sentence in the territory of the Requested State for a different offence, the Requested State shall, unless its laws otherwise provide, defer the surrender of the person sought until the conclusion of the proceedings against that person or the full execution of any punishment that may be or may have been imposed.

ARTICLE XIII

*Requests for Extradition Made by Several States*

The executive authority of the Requested State, upon receiving requests from the other Contracting Party and from any other State or States for the extradition of the same person, either for the same offence or for different offences, shall determine to which State it will extradite that person.

ARTICLE XIV

*Rule of Speciality*

(1) A person extradited under this Treaty may only be detained, tried or punished in the Requesting State for the offence for which extradition is granted, or—

(a) for a lesser offence proved by the facts before the court of committal, or in the case of extradition pursuant to Article XV, any lesser offence disclosed by the facts upon which the request is based; or

(b) for an offence committed after the extradition; or

(c) for an offence in respect of which the executive authority of the Requested State, in accordance with its laws, consents to the person's detention, trial or punishment; and for the purposes of this sub-paragraph the Requested State may require the submission of documents mentioned in Article VIII or the written views of the extradited person with respect to the offence concerned, or both; or

(d) if the person—

(i) having left the territory of the Requesting State after his extradition, voluntarily returns to it; or

(ii) being free to leave the territory of the Requesting State after his extradition, does not so leave within forty-five (45) days after the first day on which he was free to do so.

(2) A person extradited under this Treaty may not be extradited to a third State unless—

(a) the Requested State consents; or

(b) the circumstances are such that he could have been dealt with in the Requesting State pursuant to sub-paragraph (d) of paragraph (1).

ARTICLE XV

*Simplified Extradition*

If the person sought agrees in writing to extradition after personally being advised by a judge or competent magistrate of his right to further extradition proceedings, the Requested State may grant extradition without formal proceedings. Extradition pursuant to this Article shall be subject to Article XIV.

ARTICLE XVI

*Seizure and Surrender of Property*

(1) To the extent permitted under the laws in the Requested State all articles, instruments, objects of value, documents or other evidence relating to the offence may be seized and such items may be surrendered upon the granting of the extradition. The items mentioned in this Article may be surrendered even when extradition cannot be effected due to the death, disappearance, or escape of the person sought.

(2) The rights of third parties in such property shall be duly respected.

(3) The Requested State may impose conditions designed to ensure that the rights of third parties are protected and that the property is returned to the Requested State as soon as practicable.

ARTICLE XVII

*Expenses and Representation*

(1) Expenses related to the transportation of the person sought to the Requesting State shall be paid by that State. All other expenses relating to the apprehension of the person sought and to subsequent proceedings shall be borne by the Requested State. However, expenses which, in the opinion of the Parties, constitute special expenditures shall be borne by the Requesting State.

(2) The Requested State shall also provide for the representation of the Requesting State in any proceedings arising in the Requested State out of a request for extradition.

(3) No pecuniary claim arising out of the arrest, detention, examination and surrender of the person sought under the terms of this Treaty shall be made by the Requested State against the Requesting State.

(4) Paragraph (3) shall not apply to claims arising out of failure of the Requesting State to comply with conditions imposed pursuant to paragraph (3) of Article XVI.

ARTICLE XVIII

*Scope of Application*

This Treaty shall apply to offences encompassed by Article II committed before as well as after the date this Treaty enters into force if at the time of the act or omission comprising the offence such act or omission constituted an offence under the laws of both States.

ARTICLE XIX

*Ratification and Entry Into Force*

(1) This Treaty shall be subject to ratification; the instruments of ratification shall be exchanged at Washington as soon as possible.

(2) This Treaty shall enter into force thirty (30) days after the exchange of the instruments of ratification.

(3) Upon entry into force of this Treaty, the Extradition Treaty between the United States of America and the United Kingdom signed at London, December 22, 1931, shall cease to have effect between the United States of America and Jamaica. Nevertheless, the 1931 Treaty shall continue to have effect in relation to any request for extradition made before this Treaty enters into force.

ARTICLE XX

*Termination*

(1) Either Contracting Party may terminate this Treaty at any time by giving written notice to the other Party, and the termination shall be effective six (6) months after the date of receipt of such notice.

(2) Nothing in paragraph (1) shall affect any request for extradition made before the date on which the termination becomes effective.

IN WITNESS WHEREOF, the undersigned, being duly authorized by their respective Governments, have signed this Treaty.

DONE AT KINGSTON, in duplicate, this 14th day of June, 1983.

| For the Government of the United States of America | For the Government of Jamaica |
|---|---|
| William A. Hewitt | [signature] |
| Ambassador of the United States of America | Minister of National Security and Justice |

Case 0:26-mc-60822-UNA Document 1-2 Entered on FLSD Docket 03/20/2026 Page 37 of 46



# EXTRADITION TREATY WITH JAMAICA

JUNE 20, 1984.—Ordered to be printed

Mr. PERCY, from the Committee on Foreign Relations, submitted the following

## REPORT

[To accompany Treaty Doc. 98–18]

The Committee on Foreign Relations, to which was referred the Treaty on Extradition Between the United States of America and the Government of Jamaica, signed at Kingston on June 14, 1983, having considered the same, reports favorably thereon without amendment and recommends that the Senate give its advice and consent to ratification thereof.

### PURPOSE

This agreement is the first modern U.S. extradition treaty within the Caribbean region. It is intended to facilitate U.S. efforts to prosecute narcotics conspiracies by expressly providing that conspiracies and attempts to commit extraditable offenses constitute extraditable offenses.

The Treaty follows generally the form of most recent extradition treaties that have been negotiated by the United States. It identifies the offenses for which extradition will be granted, establishes procedures to be followed in presenting extradition requests, enumerates exceptions to the duty to extradite, specifies the evidence required to support a finding of a duty to extradite, and sets forth administrative provisions for bearing costs and legal representation.

### BACKGROUND

The United States can demand the return from a foreign country of a fugitive only when it has an extradition treaty in force with the country where the fugitive is located. (*Factor* v. *Laubenheimer*, 290 U.S. 276, 287, (1933)). Further, the United States can surrender a fugitive to a foreign country only on the basis of an extradition treaty. 18 U.S.C. 3184. Since 1842, the United States has negotiated extradition treaties with more than 90 countries. These treaties have become in-

creasingly important in law enforcement as modern transportation has enabled criminals to operate on an international scale and to flee more easily from country to country. In an average month, the United States receives about eight requests from treaty partners for the surrender of fugitives found in this country, and it requests the return to the United States of about fourteen persons to stand trial or to serve sentences under previous convictions. The volume of extradition cases has grown substantially in recent years, and this trend is continuing.

## Committee Action and Recommendations

The Committee on Foreign Relations held a public hearing on the Extradition Treaty with Jamaica on June 14, 1984 at which time Mr. Daniel McGovern, Deputy Legal Advisor, Department of State and Mr. Mark Richard, Deputy Assistant Attorney General, Department of Justice, testified in its support. A public witness, Mr. Nick Navarro of Dade County, Florida also testified that the Treaty can serve significant law enforcement objectives.

On June 19, 1984, at its business meeting, the Committee on Foreign Relations considered the Extradition Treaty with Jamaica in open session. At that time, the Committee, by a voice vote ordered it reported favorably to the Senate for its advice and consent.

## Section-by-Section Analysis

The U.S. Delegation, composed of representatives from the Departments of State and Justice, has provided the Committee with the following section-by-section analysis of the Treaty.

## Article-by-Article Analysis

### ARTICLE I: OBLIGATION TO EXTRADITE

Like the first article in every recent United States extradition treaty, this article formally obligates each Party to extradite to the other persons charged with or convicted of extraditable offense, subject to the provisions of the remainder of the treaty. This treaty is the first extradition treaty negotiated by Jamaica since it gained independence in 1962, and it is anticipated that Jamaica will enact new extradition legislation to carry out the obligations incurred in this treaty.[1] No new legislation is needed for the United States.

Paragraph 2 deals with the fact that many federal crimes—particularly narcotics offenses—involve acts committed wholly outside United States territory. Our jurisprudence recognizes jurisdiction in our courts to prosecute offenses committed outside of the United States if the crime was intended to, or did, have effects in this country, or if the legislative history of the statute shows clear Congressional intent to assert such jurisdiction.[2] In Jamaica, however, the government's ability to prosecute extraterritorial offenses is much more

[1] For the present, extradition from Jamaica is governed by the Treaty for the Mutual Extradition of Criminals between the United States and the United Kingdom, signed at London December 22, 1931, 47 Stat. 2122, TS 849, 12 Bevans 482 (entered into force June 24, 1935), and the English Extradition Acts 1870–1932.

[2] Restatement (Second) of the Foreign Relations of Law of the United States § 18 (1965); Blakesley, *United States Jurisdiction over Extraterritorial Crime*, 73 Journal of Criminal Law and Criminology 1109 (1982).

limited. Paragraph 2 of this Article reflects Jamaica's agreement to recognize our jurisdiction to prosecute offenses committed outside of the United States as long as Jamaican law would permit it to prosecute similar offenses committed outside of Jamaica in corresponding circumstances.

ARTICLE II: EXTRADITABLE OFFENSES

This article contains the basic guidelines for determining what are extraditable offenses. This treaty, like the recent United States extradition treaties with Italy, Ireland, Thailand, Sweden (Supplementary Convention), and Costa Rica, does not list the offenses for which extradition may be granted. Instead, the treaty permits extradition for any offense punishable under the laws of both countries by imprisonment, or other form of detention, for more than one year. Defining extraditable offenses in terms of "double criminality" rather than attempting to list each extraditable crime should obviate the need to renegotiate the treaty or supplement it should both countries pass criminal laws dealing with a new type of criminal activity, or should the list inadvertently fail to cover an important type of criminal activity punishable in both countries.

Paragraph 2 follows the practice of recent extradition treaties in providing that extradition should also be granted for conspiring, attempting, preparing, aiding or abetting, assisting, or otherwise being an accessory to an extraditable offense. The present extradition treaty in force between the United States and Jamaica does not explicitly cover conspiring to commit such offenses as narcotics smuggling.[3] Therefore, this paragraph helps close a significant "loophole" in present United States-Jamaican extradition practice.

Paragraph 3 reflects the intention of both countries to interpret the principles of the first paragraph broadly. Foreign judges are often confused by the fact that many United States federal statutes require proof of certain elements (such as use of the mails or interstate transportation) solely to establish jurisdiction in the United States federal courts. Foreign judges know of no similar requirement in their own criminal law, and on occasion have denied the extradition of fugitives sought by the United States on federal charges on this basis. This paragraph requires that such elements be disregarded in applying the double criminality principle. For example, it will insure that Jamaican authorities treat United States mail fraud charges (18 U.S.C. 1341) in the same manner as fraud charges under state laws, and view the federal crime of interstate transportation of stolen property (18 U.S.C. 2314) in the same manner as unlawful possession of stolen property. This paragraph also requires a requested country to disregard differences in the categorization of the offense in determining whether double criminality exists, and to overlook mere differences in the terminology used to define the offense under the laws of each country. A similar provision is contained in all recent United States extradition treaties.

Some recent United States extradition treaties provide that persons who have been convicted of an extraditable offense and sentenced

[3] *Ex Parte Dafney Schwartz*, No. M.11 of 1976 (Supreme Court of Jamaica, decided June 3, 1976).

to imprisonment may be extradited only if at least a certain specified portion of the sentence (often six months) remains to be served on the outstanding sentence. The treaty with Jamaica contains no such requirement. Provisions of this kind are an attempt to limit extradition to serious cases because of the significant costs associated with the process. However, the negotiators of this treaty felt that the particular sentence imposed or outstanding is not necessarily a measure of the seriousness of the crime,[4] and concluded that the goals sought by a provision of this kind can be attained as effectively by the exercise of discretion and good judgment in the administration of the Treaty without arbitrary limits imposed in the terms of the agreement itself. This is consistent with the approach taken in our extradition treaties in force with other common law countries, including England, Canada, Australia, and New Zealand.

ARTICLE III: POLITICAL AND MILITARY OFFENSES

Paragraph 1 prohibits extradition for offenses of a political character, a restriction on the extradition process contained in almost all United States extradition treaties. Paragraph 2 bars extradition where it is established that the request, though appearing to be for an extraditable offense, is in fact made for the purpose of prosecuting or punishing the person sought because of his race, religion, nationality, or political opinions, or where that person is likely to be denied a fair trial or punished, detained, or restricted in his personal liberty for these reasons. This provision goes somewhat further than similar provisions in other United States extradition treaties,[5] but is consistent with longstanding United States extradition practice, which has recognized the power of the Secretary of State to decline to extradite if persuaded that the foreign country's request is based on improper political motivation[6] or that the person sought will not receive a fair trial,[7] or for other humanitarian reasons.[8]

Paragraph 4 states that paragraphs 1 or 2 do not apply to offenses which are included in multilateral treaties to which both Jamaica and the United States are parties, which are aimed at the suppression of a specific kind of criminal conduct and which require the parties to either extradite the person sought or submit the matter for prosecution. An example of such a Punishment of Crimes Against Internationally Protected Persons, Including Diplomatic Agents, done at New York December 14, 1973, 28 UST 1975, TIAS 8532 (entered into force for the United States February 20, 1977).

Paragraph 5 provides that extradition may be denied if the offense

[4] *cf. United States v. Clark*, 470 F.Supp. 976 (D. Vt. 1979) ("Leniency in sentencing does not give rise to a bar to extradition.") Reliance on the amount of the sentence remaining to be served can also produce anomolous results. For instance, a murderer who escapes from custody with less than six months of his sentence remaining can hardly be shielded from extradition on the ground that the killing he was convicted for is not a serious offense.

[5] Many United States extradition treaties permit extradition to be denied if it shows that the request is made for political purposes (even if the offense involved is not a political offense), but no previous United States extradition treaty specifically authorizes denial of extradition for racial or religious discrimination.

[6] *Matter of Sindona*, 461 F. Supp. 199, 207 (S.D.N.Y. 1978), aff'd 619 F.2d 167 (2d Cir. 1980); *Re Locatelli*, 468 F. Supp. 568, 574–575 (S.D.N.Y. 1979); *Eain v. Wilkes*, 641 F.2d 504, 513 (7th Cir. 1981).

[7] *Matter of Sindona*, supra; Note, *Executive Discretion* in Extradition, 62 Columbia Law Review 1313 (1962).

[8] *Escobedo v. United States*, 623 F.2d 1098, 1107 (5th Cir. 1980); see note 6, supra.

is a military offense which is not a crime under ordinary criminal law. The principal example of such a crime is desertion.

### ARTICLE IV: EFFECT OF DECISION NOT TO PROSECUTE

This article preserves each country's ability to extradite an offender to the other even though it has instituted criminal proceedings against the offender itself but elected to discontinue the proceedings. The flexibility provided in these provisions is desirable in that the decision of the requested country to forego its prosecution, or to drop charges already filed, may have resulted from problems in obtaining sufficient evidence or having the necessary witnesses available for trial, problems which the requesting country may well be able to overcome.

This article will permit extradition from the United States in situations in which the activities of the fugitives result in his being charged with different offenses in both countries arising out of the same basic transaction. For example, a person in the United States who prints counterfeit Jamaican currency in an attempt to defraud other persons in the United States could be prosecuted here for fraud, then extradited to Jamaica for prosecution for counterfeiting.

Many United States extradition treaties prohibit extradition if the offender has been tried and convicted or acquitted in the Requested State for the offense for which extradition is sought. Since the extradition treaty with Jamaica contains no such provision,[9] the United States is free to extradite in such cases.

### ARTICLE V: CAPITAL PUNISHMENT

This article permits the requested country to refuse extradition when the offense for which extradition is sought would be punishable by death in the requesting country, but not in the requested country. This is a standard provision in extradition treaties with countries, such as Jamaica, where the internal law would permit extradition to the United States to be denied if the extraditee faces the death penalty here. To minimize the possibility of such a refusal of extradition, Article 5(2) provides that the executive authority of the Requested State shall give "due and sympathetic consideration to any assurances given by the Requesting State insofar as the laws of the Requesting State permit," that the death penalty will not be carried out.

The phrase "insofar" as the laws of the Requesting State permit" is not usually found in provisions of this kind, and was included because under the Jamaican legal system the power to commute a death sentence is a perogative of the Crown exercised through the Governor-General, a fact which may give the executive branch of the Jamaican government slightly less freedom to offer the assurances in question than our government enjoys. The phrase "due and sympathetic consideration" is also a phrase not found in the capital punishment provisions in other treaties, and was deemed necessary by Jamaican au-

[9] The principle of *non bis in idem* which underlies such provisions has long eluded precise definition, see *Sindona* v. *Grant*, 619 F.2d 167, 177–180 (2nd Cir. 1980) and the two delegations found that the jurisprudence in their respective countries on this matter could not be harmonized. Therefore, the treaty was left silent on this topic, with each delegation understanding that the judiciary in the other country will apply the legal rules, if any, it finds in its statutes and jurisprudence.

thorities to avoid any appearance of predetermining the Governor-General's decision on the acceptability of United States assurances.

ARTICLE VI: LAPSE OF TIME

This article provides that the requested country must deny extradition if the requesting country's statute of limitation bars the prosecution, or the enforcement of the sentence, with respect to the offense in question. The effect of this provision is to require that the requesting country provide sufficient information in its extradition documents to demonstrate that its request is not barred by its statute of limitations. Whether the prosecution would be barred by the statute of limitations of the requested country had the offense been committed there is irrelevant.

ARTICLE VII: NATIONALITY

Traditionally, the United States extradition policy has been to draw no distinction between citizens and non-citizens for purposes of extradition. Jamaican extradition law, however, will soon be altered to make the extradition of Jamaican nationals completely discretionary. For this reason, paragraph 1 does not bind either country to extradite its own nationals, but authorizes the executive authority of each country to order the surrender of one of its nationals if in its discretion, such surrender be deemed proper. When the United States is the requested state, the executive authority which will exercise the discretion confided in this provision is the Secretary of State.[10]

Paragraph 2 is pertinent to cases in which the fugitive is a dual national of both the United States and Jamaica. Persons in this category will not benefit from paragraph 1, and will be subject to extradition provided all other conditions for extradition are satisfied.

Paragraph 3 requires that if extradition is denied on the basis of nationality, the requested country must submit the case to its competent authorities for prosecution. The paragraph makes it clear, however, that this obligation does not apply if the requested country has no jurisdiction over the crime.

ARTICLE VIII: EXTRADITION PROCEDURES AND REQUIRED DOCUMENTS

This article sets out the documentary and evidentiary requirements for an extradition request, and is generally similar to the corresponding articles on this topic in most recent United States extradition treaties.

It should be noted that paragraph 3(b) requires that if the fugitive is a person who has not yet been convicted of the crime for which extradition is requested, the requesting country must provide "such evidence as would justify the committal for trial of that person if the offense had been committed in the Requested State." Where the United States is the requesting country, Jamaican law requires that a *prima facie* case be established before this provision would be satisfied. Where Jamaica is the requesting country, this paragraph requires the submission of sufficient evidence to establish probable cause to believe that

[10] *Escobedo v. United States*, 623 F.2d 1098 (5th Cir. 1980).

crime for which extradition was requested has been committed and that the person sought committed it. As in the case of a probable cause finding at a preliminary examination of a person arrested on federal charges in the United States, the extradition magistrate's finding of probable cause may be based on hearsay evidence in whole or part.

ARTICLE IX: ADDITIONAL INFORMATION

This article specifically provides for the submission of additional evidence or information if the original request and supporting documentation is deemed insufficient by the requested country. The article also sets forth the effect of a failure to submit additional documentation in timely manner. It is intended to provide a basis for the country requesting extradition to request and receive from the courts considering the case in the other country a reasonable extension of time to obtain and transmit the additional requested documents or evidence in order to cure any defects found by either the court or the government attorney representing the country requesting extradition.

ARTICLE X: PROVISIONAL ARREST

This article deals with the process by which a person in one country may be arrested and detained while the formal extradition papers are being prepared. The article provides that the fugitive shall be detained no more than 60 days, and must be released from detention if the requesting country does not file a fully documented request for extradition with the executive authority of the requested country within that time. When the United States is the requested state, the "executive authority" is the State Department.[11] Paragraph 5 states that if the documents are not received within the 60 day period, the proceedings against the fugitive need not be dismissed, and that he may be taken into custody again and the extradition proceedings may commence when the formal request is presented.

This article further provides that a request for provisional arrest may be made directly between the Department of Justice in the United States and the Minister responsible for extradition in Jamaica (currently the Minister for National Security and Justice). Experience has shown that the ability to use these channels in emergency situations can be crucial when a fugitive is poised to flee.

ARTICLE XI: DECISION AND SURRENDER

This article requires that the requested country promptly notify the requesting country of its decision on the extradition request. If extradition is granted, it requires that the requesting country remove the fugitive within the time period set by the law of the requested country. In both the United States and Jamaica, that period is two months.[12] If extradition is denied, the second paragraph of the article provides that the requested country must provide such information as may be available as to the reasons for the denial.

[11] *United States* v. *Clark*, 470 F. Supp. 976 (D. Vt. 1979).
[12] See 18 U.S.C. 3188 and Sec. 12, Extradition Act 1870 (Jamaican law).

ARTICLE XII: DEFERRED SURRENDER

Occasionally, a person sought for extradition is being prosecuted or serving a sentence on other charges in the requested country. This article codifies the practice followed by the United States and Jamaica of permitting the requested country to defer extradition in such circumstances until the conclusion of the proceedings against the person sought and the service of any punishment that may have been imposed.

ARTICLE XIII: REQUEST FOR EXTRADITION MADE BY SEVERAL STATES

Many recent United States extradition treaties list factors which the requested country may consider in determining to which country a person should be surrendered when that country receives a request from two or more countries for extradition of the same person. This treaty does not attempt to list such factors. Instead, it simply and succinctly states the rule that the executive authority the requested country shall make the decision in such cases. For the United States, the Secretary of State will make the decision.

ARTICLE XIV: RULE OF SPECIALITY

This article covers the principle known as the Rule of Speciality, which is a standard aspect of United States extradition practice. Designed to insure that a fugitive surrendered for one offense is not tried for other crimes, the Rule of Speciality prevents an apparently valid request for extradition from being used as a subterfuge to obtain custody of a person for trial or service of sentence on different charges. Since a variety of exceptions to the rule have developed over the years, this article provides that a person extradited under the treaty may be detained, tried, or punished in the requesting country for:

(1) the offense for which extradition was granted;

(2) a lesser offense revealed by the facts in the extradition request or proven during the extradition hearing;

(3) a crime committed in the Requesting State after extradition;

(4) any offense, if the fugitive was permitted to leave the requesting country, but failed to do so within forty-five days; or

(5) any offense, if the fugitive voluntarily returns to the requesting country after leaving it.

The article also permits detention, trial, or punishment in the requesting country for an offense other than that for which the extradition was granted if the requested country consents to such detention, trial, punishment in accordance with its laws.[13]

It also provides that a fugitive extradited under the treaty may not be extradited from the requesting country to a third country without the consent of the requested country unless he fails to leave the requesting country within a period of forty-five days of being free to leave, or voluntarily returns after having left.

[13] In the United States, the Secretary of State has the authority to grant such consent. See, *Berenguer v. Vance*, 473 F. Supp. 1195 (D.D.C. 1979).

ARTICLE XV: SIMPLIFIED EXTRADITION

Persons sought for extradition frequently wish to waive extradition proceedings and expedite their return to the requesting country. This article is intended to provide a framework for such waivers. It states that such waivers must be in writing, and may be given only after the person sought has been advised by a judge or magistrate of his right to a formal proceeding. The article also requires that a fugitive surrendered pursuant to this provision be entitled to the protection of the Rule of Speciality.

ARTICLE XVI: SEIZURE AND SURRENDER OF PROPERTY

This article carries forward, with greater elaboration, the principles found in the present extradition treaty between the United States and Jamaica. It provides for the seizure by the requested country of all property—articles, instruments, objects of value, documents, or other evidence—relating to the offense. The article also provides that these objects may be surrendered to the requesting country on the granting of the extradition or if extradition cannot be effected due to the death, disappearance, or escape of the fugitive. The obligation to surrender property imposed by this provision is expressly made subject to the rights of third parties to such property. The requested country can also condition its surrender of property in such a way as to insure that the rights of third parties are protected and that the property is returned as soon as possible.

ARTICLE XVII: EXPENSES AND REPRESENTATION

Paragraph 1 provides that requested country will bear all expenses of extradition except the expenses relating to the ultimate transportation of a fugitive to the requesting country, which is an expense which will be paid by the country which initiated the request. However, it leaves the parties free to designate "special expenditures" to be paid by the requesting country.

The second paragraph codifies present practice by stating that the United States will provide for the representation of Jamaica in extradition cases in this country and that Jamaica will provide for the representation of the United States in connection with our extradition requests to Jamaica. In the past, such reciprocal representation arrangements have provided the United States with high quality legal representation in extradition cases at low cost. This arrangement also assures better coordinated and more uniform handling of foreign extradition requests before the United States' courts.

Paragraphs 3 and 4 provide that the requested country shall make no pecuniary claim against the requesting country in connection with extradition proceedings, including arrest, detention, examination, and surrender of the fugitive. An exception is made for claims which the requested country may wish to press arising out of failure of the requesting country to return evidence surrendered pursuant to Article XVI.

ARTICLE XVIII: SCOPE OF APPLICATION

This treaty, like most other United States extradition treaties negotiated in the past two decades, is expressly made retroactive.

ARTICLE XIX: RATIFICATION AND ENTRY INTO FORCE

This article contains standard treaty language providing that the instruments of ratification will be exchanged in Washington, D.C. and that the treaty will enter into force thirty days after that exchange. It also provides that while the present extradition treaty ceases to have effect on the entry into force of this treaty, extradition requests pending at that time will nevertheless be processed to conclusion under the present treaty.

ARTICLE XX: TERMINATION

This article contains standard treaty language describing the procedure for termination of the treaty by either party.

## Entry Into Force

The Treaty shall enter into force thirty days after the exchange of the instruments of ratification.

On the entry into force of the Treaty, the Extradition Treaty between the United States of America and the United Kingdom signed at London, December 22, 1931, shall cease to have effect between the United States of America and Jamaica. Nevertheless, the 1931 Treaty shall continue to have effect in relation to any request for extradition made before this Treaty enters into force.

## Resolution of Ratification

*Resolved*, (*two-thirds of the Senators present concurring therein*), That the Senate advise and consent to the ratification of the Treaty of Extradition Between the United States of America and the Government of Jamaica, signed at Kingston on June 14, 1983.

○