**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

Case No. 26-MC-60822-HUNT

IN THE MATTER OF
THE EXTRADITION OF
ONEIL JOEL MITCHELL
a/k/a "OILEY" a/k/a "OILY"
_________________________________/

**MEMORANDUM IN SUPPORT OF EXTRADITION**

The United States requests that the Court certify to the Secretary of State that Oneil Joel MITCHELL ("MITCHELL") can be extradited to Jamaica pursuant to 18 U.S.C. § 3184 and the United States' treaty obligations to Jamaica.[1] An extradition hearing is scheduled for August 10, 2026, at 10:30 a.m.

As discussed below, at this stage of the proceedings, the Court should certify Jamaica's request for MITCHELL's extradition to the Secretary of State, so that the Secretary of State can make the final determination whether to grant Jamaica's request. At this stage, the Court's limited role under 18 U.S.C. § 3184 is to determine whether the five requirements to certify MITCHELL's extraditability to the Secretary of State are satisfied. The evidence Jamaica has submitted fulfills the relevant Treaty requirements and shows the following: (1) this Court has authority over the proceedings; (2) this Court has jurisdiction over MITCHELL; (3) the Treaty is in full force and effect; (4) the Treaty covers the charged crime; and (5) the evidence establishes probable cause to believe that MITCHELL committed the offense. Accordingly, the United States requests that the Court certify to the Secretary of State that MITCHELL is extraditable so that the Secretary can determine whether to surrender him to Jamaica.

---

[1] *See* Extradition Treaty Between the Government of the United States of America and the Government of Jamaica, U.S.-Jam., June 14, 1983, 1983 U.S.T. LEXIS 419 (the "Treaty").

## BACKGROUND

### The Jamaican Offense

Jamaica seeks the extradition of MITCHELL so that he may be prosecuted for the murder of Derricka Rodgers ("Rodgers"), in violation of the common law of Jamaica. This offense was committed within the jurisdiction of Jamaica. The Justice of the Peace of the Parish of Clarendon, Jamaica, issued a warrant for MITCHELL's arrest on June 10, 2025. According to the information Jamaica has provided:

According to Dana Scarlett ("Scarlett"): On or about May 26, 2025, at approximately 7:50 a.m., Rodgers sent Scarlett a voice note via WhatsApp, stating that Rodgers' boyfriend, "Oily," had put a gun to her head and pulled the trigger. The gun made a clicking sound but did not fire. On May 27, 2025, at approximately 8:30 a.m., Rodgers visited Scarlett's house and told Scarlett that she was going to meet "Oily" in May Pen, Clarendon, to collect money from him, and that she intended to spend the remainder of the day with him. Rodgers left Scarlett's home at approximately 10:15 a.m. This was the last time Scarlett saw or spoke with Rodgers.

Also on or about May 27, 2025, at approximately noon, Rodgers sent a voice note to her mother, in which Rodgers stated that she was in the company of MITCHELL a/k/a Oily in Milk River, Clarendon.

According to Kevin Badley ("Badley"): Before May 27, 2025, he knew both Rodgers and MITCHELL a/k/a "Oily," who had been in an intimate relationship since approximately January 2025. Throughout the afternoon and evening of May 27, 2025, Badley and other family members attempted unsuccessfully to contact Rodgers. Rodgers did not return home on that date, and none

of her family members knew her whereabouts. On May 28, 2025, at approximately 11:30 a.m., Badley reported to Jamaican police that Rodgers was missing.

According to Everald Morris ("Morris"), Rodgers' employer: On May 27, 2025, at approximately 7:31 a.m., Morris received a phone call from Rodgers regarding her attendance at the office in May Pen, Clarendon. Morris told Rodgers that she was not required to report to the office. Rodgers did not come to work that day or at any point afterwards.

Later that day, between 2 and 3 p.m., Rodgers' father (Derrick Rodgers) saw Rodgers near the May Pen police station. This is the last confirmed sighting of Rodgers. Rodgers' subsequently tried to contact Rodgers but could not reach her.

According to friends/associates of MITCHELL, after Rodgers disappeared, MITCHELL had a nervous demeanor, concealed his motor vehicle, and advanced his departure to the United States, which was originally scheduled for June 1, 2025, to May 29, 2025.

According to Sheryll Spence ("Spence"): Spence had a close relationship with MITCHELL a/k/a "Oily." She heard that Rodgers was missing and that MITCHELL was the last person to see her. On May 29, 2025, at approximately 8 p.m., Spence called MITCHELL, told him he was heavily implicated in Rodgers' disappearance, and advised him to get a lawyer to clear his name. MITCHELL responded that he did not have time for a lawyer and was planning to move from his current location.

On or about June 1, 2025, members of Rodgers' family went to the premises in Deeside District, Clarendon, where MITCHELL a/k/a "Oily" lived. In the yard, Rodgers' father saw a sewage pit that looked like somebody had tampered with it; the surrounding concrete was broken. Rodgers' family contacted the police. Sergeant K. Brown and Constable Tulloch came to the

property. Upon opening the sewage pit, they found Rodgers' body, wrapped in a gray sheet. They also found a garbage bag, which contained a national identification, passport, food handler's permit, and other forms of identification that belonged to Rodgers. Rodgers' father identified the body as belonging to his daughter, Derricka Rodgers. He also recognized the necklace she was wearing, which featured a pendant with the letter "D."

The caretaker of the property where Rodgers' body was found, Hugh Clive Watkis ("Watkis"), confirmed to Jamaican authorities that "Oily" a/k/a MITCHELL had keys to the premises and had resided there for over a year.

According to Detective Corporal Damian Morgan: The grounds of the property where Rodgers' body was found had a CCTV system that captured the exterior of the premises, including the sewage pit. Jamaican authorities obtained footage from the relevant date, which Detective Corporal Morgan reviewed, and which depicts the following: A black motor vehicle drives onto the premises. MITCHELL a/k/a "Oily," the driver, is the only person in the vehicle and the only person on the property within the visible area. He parks the vehicle next to what appears to be a cemented sewage pit; removes the cover of the pit; throws a black bag into the pit; struggles to remove a large object from the vehicle; places this object in the pit; covers the pit; removes debris from the pit; leaves and returns with a bucket of brown material that appears to be cement; spreads the brown material around the pit; and leaves in the vehicle.

According to Clement Johnson ("Johnson"): On May 28, 2025, MITCHELL a/k/a "Oily" told him that the police from Milk River had contacted him in relation to a missing female. MITCHELL claimed that he had dropped her off in May Pen, but Johnson observed that MITCHELL appeared worried and seemed anxious to leave the country. MITCHELL originally

showed Johnson a flight itinerary for June 1, 2025, but then moved up his departure date to the early morning of May 29, 2025. On May 29, 2025, at approximately 3 a.m., MITCHELL arrived at Johnson's house to go to the airport. During the drive, MITCHELL was unusually quiet and struggled to stay on the road. Because of this behavior, Johnson eventually took over the wheel. JOHNSON reviewed portions of the above-described CCTV footage, which he identified as depicting MITCHELL a/k/a "Oily." Johnson also identified two photographs as depicting MITCHELL a/k/a "Oily."

On June 21, 2025, a forensic pathologist performed a post-mortem examination of Rodgers' body. The pathologist determined that the cause of Rodgers' death was multiple blunt force trauma to the head.

**Procedural History**

On March 20, 2026, this Court issued a provisional arrest warrant for MITCHELL, with a view toward extradition, pursuant to a request from Jamaica under the authority of the Treaty. On March 25, 2026, MITCHELL was provisionally arrested. On May 21, 2026, Jamaica submitted a formal extradition request for Mitchell to the United States, via the diplomatic channel, pursuant to the Treaty.[2]

## APPLICABLE LAW

### I. The Role of the Judge in Extradition Proceedings

An extradition proceeding "is not a criminal proceeding." *Martin v. Warden, Atlanta Penitentiary*, 993 F.2d 824, 828 (11th Cir. 1993). The "magistrate does not inquire into the guilt

[2] *See* Declaration of Amy Lindsay, Attorney-Adviser, Office of the Legal Adviser for the U.S. Department of State, dated May 29, 2026 (the "Lindsay Declaration"), at ¶ 3. **Exhibit 1** hereto includes copies of the Lindsay Declaration, the Treaty, and Jamaica's extradition request.

or innocence of the accused." *Kastnerova v. United States*, 365 F.3d 980, 987 (11th Cir. 2004) (internal quotation marks and citation omitted); *see also*, *e.g.*, *Benson v. McMahon*, 127 U.S. 457, 463 (1888) ("[T]he proceeding before the [extradition judge] is not to be regarded as in the nature of a final trial by which the prisoner could be convicted or acquitted of the crime charged against him . . . ."); *Arias v. Warden*, 928 F.3d 1281, 1286 (11th Cir. 2019) ("A United States court dealing with an extradition request for an accused is obliged to resist any temptation to judge the guilt or innocence of the accused." (internal quotation marks and citation omitted)). Rather, the government must show only "probable cause that the fugitive is guilty." *Kastnerova*, 365 F.3d at 987 (internal quotation marks omitted); *see also*, *e.g.*, *Collins v. Loisel*, 259 U.S. 309, 316 (1922) ("The function of the committing magistrate is to determine whether there is competent evidence to justify holding the accused to await trial, and not to determine whether the evidence is sufficient to justify a conviction.").

"The power to extradite derives from the President's power to conduct foreign affairs." *Martin*, 993 F.2d at 828 (citing U.S. Const. art. II, § 2, cl. 2). Thus, extradition is largely an executive responsibility. That said, the Executive delegates "an independent review function" to the judiciary, as defined by the extradition statute. *Id.* So, the judicial officer presiding over a Section 3184 extradition hearing does not exercise "any part of the judicial power of the United States" but, rather, acts in a "non-institutional capacity by virtue of a special authority." *In re Extradition of Howard*, 996 F.2d 1320, 1325 (1st Cir. 1993) (internal quotation marks and citations omitted). The extradition statute authorizes a judicial officer to exercise this special authority to determine whether to certify to the Secretary of State that the submitted evidence is "sufficient to

sustain the charge." 18 U.S.C. § 3184; *see also* *Kastnerova*, 365 F.3d at 987; *Zhenli Ye Gon v. Holt*, 774 F.3d 207, 210 (4th Cir. 2014).

At the extradition hearing, a court's role is to consider the evidence presented on behalf of the requesting country and determine whether the legal requirements for certification are satisfied. *See Charlton v. Kelly*, 229 U.S. 447, 461 (1913); *Cheung v. United States*, 213 F.3d 82, 88 (2d Cir. 2000). If the court finds that the requirements for certification have been met, the court must furnish a certification to the Secretary of State, together with a copy of any testimony taken before the court, and must commit the fugitive to the custody of the United States Marshals Service to await the Secretary's final determination regarding surrender. 18 U.S.C. § 3184 (stating that if the requirements are met, the judicial officer "shall certify the same" and "shall issue his warrant for the commitment of the person so charged to the proper jail, there to remain until such surrender shall be made"); *see Martin*, 993 F.2d at 828. The Secretary of State, and not the Court, decides whether the fugitive should ultimately be surrendered to the requesting country. *See* 18 U.S.C. § 3186; *Plaster v. United States*, 720 F.2d 340, 354 (4th Cir. 1983) (explaining that the "ultimate decision to extradite . . . is reserved to the President and, by a limited delegation of authority, to the Secretary of State").

## II. <u>Procedures During the Extradition Hearing</u>

### A. An extradition hearing is not a criminal proceeding.

As noted above, an extradition hearing is not a criminal proceeding. Its purpose is to decide whether sufficient evidence supports the foreign charge under the applicable treaty, not to determine the guilt or innocence of the accused. *Collins*, 259 U.S. at 314–15. A fugitive's guilt or innocence is determined by a foreign court through "a trial according to the modes established

in the country where the crime was committed[.]" *Neely v. Henkel*, 180 U.S. 109, 123 (1901); *see Haxhiaj v. Hackman*, 528 F.3d 282, 292 (4th Cir. 2008) ("Determining the ultimate guilt of the accused, therefore, is a function committed to the justice system of the requesting country.").

**B. Unique procedures apply.**

Given the unique and limited nature of extradition proceedings, and the United States' international obligations under extradition treaties, limited procedural and evidentiary rules apply to extradition hearings. By their express terms, neither the Federal Rules of Criminal Procedure nor the Federal Rules of Evidence apply to extradition proceedings. *See* Fed. R. Crim. P. 1(a)(5)(A) ("Proceedings not governed by these rules include . . . the extradition and rendition of a fugitive."); Fed. R. Evid. 1101(d)(3) ("These rules—except for those on privilege—do not apply to . . . miscellaneous proceedings such as extradition or rendition.").

Nor is the fugitive entitled to certain rights normally attendant to criminal proceedings in the United States. Because extradition hearings "are not to be converted into a dress rehearsal trial," a fugitive's rights to discovery and to present evidence are severely constrained. *Cf. Koskotas v. Roche*, 931 F.2d 169, 175 (1st Cir. 1991) (upholding denial of discovery); *Jhirad v. Ferrandina*, 536 F.2d 478, 484 (2d Cir. 1976) (same); *Shapiro v. Ferrandina*, 478 F.2d 894, 900–01 (2d Cir. 1973) (explaining that a judicial officer may properly exclude "evidence of alibi," "facts contradicting the demanding country's proof," or proof of a defense).

The circumscribed nature of extradition proceedings limits the fugitive's opportunity to challenge the evidence introduced against him. For example, a fugitive's "right to introduce evidence is . . . limited to testimony which *explains* rather than contradicts the demanding country's proof[.]" *Shapiro*, 478 F.2d at 905 (internal quotation marks and citation omitted) (emphasis added); *see also*, *e.g.*, *Jimenez v. Aristeguieta*, 311 F.2d 547, 556 (5th Cir. 1962); *In re Extradition*

*of Martinelli Berrocal*, 2017 WL 3776953, at *9 (S.D. Fla. Aug. 31, 2017); *Collins*, 259 U.S. at 315–17; *Castro Bobadilla v. Reno*, 826 F. Supp. 1428, 1433 (S.D. Fla. 1993).

In extradition proceedings, fugitives may not introduce contradictory evidence, and courts have routinely excluded evidence bearing on the credibility of witnesses. *See, e.g.*, *United States v. Peterka*, 307 F. Supp. 2d 1344, 1349 (M.D. Fla. 2003) (explaining that "the court shall exclude evidence that is proffered to contradict testimony, challenge the credibility of witnesses, or establish a defense to the crimes alleged"); *In re Extradition of Powell*, 4 F. Supp. 2d 945, 958 (S.D. Cal. 1998) (denying fugitive's motion to introduce evidence, and finding that fugitive was "foreclosed from presenting evidence as to the unreliability of witnesses because . . . [that would] change an extradition hearing into more than it is meant to be, *i.e.*, a minitrial" and "it is inappropriate to present evidence contradicting that proffered by the [requesting country]"); *see also Santos v. Thomas*, 830 F.3d 987, 1002–03 (9th Cir. 2016) (approving exclusion of "statements contest[ing] the credibility of the original statements, . . . [*i.e.*] offering reasons why the government's evidence should not be believed"); *In re Extradition of Singh*, 124 F.R.D. 571, 577 (D.N.J. 1987) (denying request for depositions intended to uncover evidence affecting credibility or reliability of affidavits supporting extradition); *In re Atias to Israel*, 916 F. Supp. 2d 915, 930 (E.D. Mo. 2012) (denying requests for discovery of "items relate[d] to issues of a defense to the charges or the credibility of the [requesting country's] evidence").

A contrary rule might compel the "demanding government to produce all its evidence . . . both directing and rebutting, in order to meet the defense thus gathered from every quarter." *Collins*, 259 U.S. at 316 (citation omitted). The admission of such explanatory evidence is largely within the discretion of the court. *E.g.*, *Matter of Extradition of Ben-Tov*, 2006 WL 8463565, at

*2 (S.D. Fla. Feb. 27, 2006); *In re Extradition of Sindona*, 450 F. Supp. 672, 685 (S.D.N.Y. 1978) (citing *Collins*, 259 U.S. at 315–17).

In addition, courts routinely reject technical and affirmative defenses in extradition proceedings. *See Bingham v. Bradley*, 241 U.S. 511, 517 (1916) (rejecting objections that "savor of technicality"); *Shapiro*, 478 F.2d at 901 (citing *Charlton*, 229 U.S. at 456). "And an extraditee is also not permitted to introduce evidence that seeks to impeach the credibility of the demanding country's witnesses." *Martinelli*, 2017 WL 3776953, at *9 (citing *Bovio v. United States*, 989 F.2d 255, 259 (7th Cir. 1993); *see also*, *e.g.*, *Santos v. Thomas*, 830 F.3d 1002-03 (9th Cir. 2016) (en banc) (defense evidence that poses a "conflict of credibility" is inadmissible contradictory evidence); *Shapiro*, 478 F.2d at 905 (evidence that would pose conflict of credibility "should properly await trial in Israel"); *United States v. Peterka*, 307 F. Supp. 2d 1344, 1349 (M.D. Fla. 2003). Such issues, which require factual or credibility determinations, are for the courts in the requesting country to resolve.

Moreover, the fugitive's constitutional rights are limited. For example, the fugitive has no right to cross-examine a witness who might testify, *Skaftouros v. United States*, 667 F.3d 144, 155 n.16 (2d Cir. 2011); there is no right for the fugitive to confront his accusers, *id.* (citing *Bingham*, 241 U.S. at 517; there is no right to a speedy extradition, *Martin*, 993 F.2d at 829; and the Fourth Amendment's exclusionary rule is not applicable, *Simmons v. Braun*, 627 F.2d 635, 636–37 (2d Cir. 1980).

### C. Extradition hearings rely on written submissions and do not require live witnesses.

A certification of extradition may be, and typically is, based entirely on the authenticated documentary evidence and information that the foreign government requesting extradition has

provided. *See, e.g.*, *Shapiro*, 478 F.2d at 902; *cf. Collins*, 259 U.S. at 317 (noting that "unsworn statements of absent witnesses may be acted upon" even if such statements would ordinarily be prohibited). The admissibility of documents offered at an extradition hearing is governed by 18 U.S.C. § 3190, which provides:

> Depositions, warrants, or other papers or copies thereof offered in evidence upon the hearing of any extradition case shall be received and admitted as evidence on such hearing for all the purposes of such hearing if they shall be properly and legally authenticated so as to entitle them to be received for similar purposes by the tribunals of the foreign country from which the accused party shall have escaped, and the certificate of the principal diplomatic or consular officer of the United States resident in such foreign country shall be proof that the same, so offered, are authenticated in the manner required.

(18 U.S.C. § 3190; *see also Afanasjev v. Hurlburt*, 418 F.3d 1159, 1164 (11th Cir. 2005) (probable cause determination based on an unsworn bill of indictment). Indeed, requiring the "demanding government to send its citizens to another country to institute legal proceedings, would defeat the whole object of the treaty." *Bingham*, 241 U.S. at 517. Nor does a judicial officer's reliance on written documentation implicate the rule against hearsay because hearsay evidence is admissible at an extradition hearing and may fully support the court's findings leading to a certification under § 3184. *See Haxhiaj*, 528 F.3d at 292 ("[C]ourts have consistently concluded that hearsay is an acceptable basis for a probable cause determination in the extradition context."); Fed. R. Evid. 1101(d)(3) ("These rules—except for those on privilege—do not apply to . . . miscellaneous proceedings such as extradition or rendition.").

Here, as the Lindsay Declaration states, the documents Jamaica submitted comply with 18 U.S.C. § 3190, and therefore are admissible in extradition proceedings, because the principal diplomatic officer of the United States in Jamica certified them. (Lindsay Decl. ¶ 6.)

**D. There is a rule of non-inquiry: The Executive considers all matters other than sufficiency.**

In extradition proceedings, the rule of non-inquiry "precludes courts from assessing the investigative, judicial, and penal systems of foreign nations when reviewing an extradition request. . . . [Courts] have neither the power nor competence to consider a foreign fugitive's concerns about the fairness of his country's criminal justice system, let alone halt his extradition on that basis—that kind of consideration is properly addressed to the Executive Branch." *Arias*, 928 F.3d at 1295. In other words, a judicial officer reviews only the sufficiency of the evidence, *see* 18 U.S.C. § 3184, and the Court is "bound by the existence of an extradition treaty to assume that the trial" in the requesting state "will be fair," *Glucksman v. Henkel*, 221 U.S. 508, 512 (1911); *Martinelli*, 2017 WL 3776953, at *28-29. All other matters fall within the ambit of the Executive's power to conduct foreign affairs. In making extradition determinations, "[t]he Secretary exercises broad discretion and may properly consider factors affecting both the individual defendant as well as foreign relations—factors that may be beyond the scope of the magistrate judge's review." *Sidali v. I.N.S.*, 107 F.3d 191, 195 n.7 (3d Cir. 1997); *see also Hurtado v. U.S. Atty. Gen.*, 401 F. App'x 453, 456 (11th Cir. 2010). The Secretary considers humanitarian claims and applicable statutes, treaties, or policies regarding appropriate treatment in the receiving country. *See Ntakirutimana v. Reno*, 184 F.3d 419, 430 (5th Cir. 1999). This is consistent with the long-held understanding that surrender of a fugitive to a foreign government is "purely a national act . . . performed through

the Secretary of State" within the Executive's prerogative. *See In re Kaine*, 55 U.S. 103, 110 (1852); *Martin*, 993 F.2d at 828.

## III. <u>The Requirements for Certification</u>

The Court must certify to the Secretary of State that a fugitive is extraditable when the following requirements have been met: (1) the judicial officer is authorized to conduct the extradition proceeding; (2) the court has jurisdiction over the fugitive; (3) the applicable treaty is in full force and effect; (4) the applicable treaty covers the crime for which extradition is requested; and (5) sufficient evidence exists to support a finding of probable cause as to each crime for which extradition is sought. *In re Extradition of Shaw*, No. 14-81475, 2015 WL 3442022, at *5 (S.D. Fla. May 28, 2015) (citing *Fernandez v. Phillips*, 268 U.S. 311, 312 (1925); *Yapp v. Reno*, 26 F.3d 1562, 1565 (11th Cir.1994)); *see also, e.g.*, *Martinelli*, 2017 WL 3776953, at *10. All requirements are met here; therefore, the Court should issue a certification to the Secretary of State.

### A. The Court is authorized to conduct the extradition hearing.

The extradition statute authorizes proceedings to be conducted by "any justice or judge of the United States, or any magistrate judge authorized so to do by a court of the United States, or any judge of a court of record of general jurisdiction of any State[.]" 18 U.S.C. § 3184. The extradition statute therefore expressly permits a magistrate judge to render a certification, and this District's local rules expressly authorize magistrate judges to "[c]onduct extradition proceedings, in accordance with 18 U.S.C. § 3184." *See* Magistrate Judge Rules for the U.S. District Court for the Southern District of Florida, Rule 1(a)(3). Thus, the Court is authorized to preside over the extradition proceedings.

**B. The Court has jurisdiction over MITCHELL.**

A court has jurisdiction over a fugitive found within its jurisdictional boundaries. *See* 18 U.S.C. § 3184 ("[A judge] may, upon complaint made under oath, charging any person found within his jurisdiction … issue his warrant for the apprehension of the person so charged."). When the Court's arrest warrant was executed, MITCHELL was in Broward County, in the Southern District of Florida. Thus, the Court has jurisdiction over MITCHELL.

**C. The Treaty is in full force and effect.**

Extradition is appropriate when a treaty or convention is in full force and effect between the requesting state and the United States. 18 U.S.C. § 3184; *see also Kastnerova*, 365 F.3d at 987 (dismissing habeas petition challenging certification of extradition, because, among other reasons, district court did not err in determining extradition treaty to be valid).

When determining whether a treaty is in full force and effect, a court defers to the determination of the Department of State. *See Terlinden v. Ames*, 184 U.S. 270, 288 (1902) (rejecting challenge to extradition to German Empire as the United States Government treated treaty as being in full force and effect, notwithstanding absorption of Bavaria into German Empire); *Meza v. U.S. Atty. Gen.,* 693 F.3d 1350, 1358 (11th Cir. 2012) ("we defer to the executive in determining whether an extradition treaty remains in force . . . Because a member of the executive branch attested that an extradition treaty remains in force between the United States and Honduras, we decline to hold the treaty invalid."). Here, as the Lindsay Declaration attests, the Treaty is in full force and effect. (Lindsay Decl. ¶ 2.)

**D. The Treaty covers the crime for which Jamaica seeks extradition.**

The offense with which MITCHELL is charged— murder —is extraditable under the Treaty. An extradition treaty creates an obligation for the United States to surrender fugitives under the circumstances the treaty specifies. As relevant here, the Treaty requires the United States to extradite persons charged with committing an "extraditable" offense. Treaty, art. I(a). An offense is extraditable if it is punishable under the laws of both countries by "imprisonment or other forms of detention for a period of more than one year or by any greater punishment." *Id.*, art. II(1). Further, an offense is extraditable regardless of "whether or not [it] is one for which United States federal law requires proof of interstate transportation, or use of the mails or of other facilities affecting interstate or foreign commerce, such matters being merely for the purpose of establishing jurisdiction in a United States federal court." *Id.*, art. II(3)(b).

In assessing whether the Treaty covers the offense for which Jamaica seeks extradition, the Court should examine the description of criminal conduct that Jamaica has provided and determine whether that conduct, if it had been committed in the United States, would be criminal under U.S. federal law, the law of the state in which the hearing is held, or the law of a preponderance of the states. *See Wright v. Henkel*, 190 U.S. 40, 60–61 (1903); *Arias*, 928 F.3d at 1292-93; *Gallo-Chamorro v. United States*, 233 F.3d 1298, 1306 (11th Cir. 2000). This is commonly referred to as the dual criminality requirement. Because extradition treaties should be "interpreted with a view to fulfil our just obligations to other powers[,]" *Grin v. Shine*, 187 U.S. 181, 184 (1902); *see Factor v. Laubenheimer*, 290 U.S. 276, 303 (1933), the Court should "approach challenges to extradition with a view towards finding the offense[] within the treaty," *McElvy v. Civiletti*, 523 F. Supp. 42, 48 (S.D. Fla. 1981); *see also Martinez v. United States*, 828 F. 3d 451, 463 (6th Cir.

2016) (*en banc*) ("The point of an extradition treaty after all is to facilitate extradition . . . ."). A requesting country need not establish that its crimes (or the elements of the crimes) are identical to crimes in the United States. *Zhenli Ye Gon*, 774 F.3d at 217 (collecting cases). Indeed, "[t]he law does not require that the name by which the crime is described in the two countries shall be the same; nor that the scope of the liability shall be coextensive, or, in other respects, the same in the two countries. It is enough if the particular act charged is criminal in both jurisdictions." *Collins*, 259 U.S. at 312; *see also, e.g.*, *Arias*, 928 F.3d at 1293 ("Dual criminality does not require that the elements, purposes, or punishment for foreign offenses be identical to ours." (internal quotation marks and citation omitted)); *Clarey v. Gregg*, 138 F.3d 764, 765 (9th Cir. 1998) ("The primary focus of dual criminality has always been on the conduct charged.").

In fulfilling its function under § 3184, the Court should construe liberally the applicable extradition treaty to effectuate its purpose, namely the surrender of fugitives to the requesting country. *Factor v. Laubenheimer*, 290 U.S. 276, 293, 303 (1933). Because extradition treaties should be "interpreted with a view to fulfil[l] our just obligations to other powers," *Grin v. Shine*, 187 U.S. 181, 184 (1902), the Court "must approach challenges to extradition with a view toward finding the offense within the treaty," *McElvy v. Civiletti*, 523 F. Supp. 42, 48 (S.D. Fla. 1981). *Cf. Martinez v. United States*, 828 F.3d 451, 463 (6th Cir. 2016) (*en banc*) ("The point of an extradition treaty after all is to facilitate extradition[.]").

Here, the description of MITCHELL's conduct in the official documents provided by Jamaica satisfies the Treaty's dual criminality requirement.

The Treaty's dual criminality requirement is satisfied here. Jamaica's submissions reflect that under Jamaican law; the offense of murder carries a potential sentence of death or life

imprisonment. Additionally, the conduct underlying MITCHELL's murder charge would be criminal under 18 U.S.C. § 1111 (which carries a potential penalty of life imprisonment) and Fla. Stat. § 782.04 (which carries a potential penalties of death or life imprisonment for first-degree murder and a potential penalty of life imprisonment for second-degree murder).[3]

Accordingly, the Treaty covers the offense for which Jamaica seeks MITCHELL's extradition.

**E. The evidence Jamaica cites establishes probable cause to believe that MITCHELL committed the offense underlying the extradition request.**

Extradition hearings under § 3184 are "in the nature of a preliminary hearing." *Kastnerova*, 365 F.3d at 987. Accordingly, the Government does "not have to show actual guilt, only probable cause that the fugitive is guilty. The magistrate does not inquire into the guilt or innocence of the accused; he looks only to see if there is evidence sufficient to show reasonable ground to believe the accused guilty." *Id.* "[P]robable cause requires only a probability or substantial chance of criminal activity." *Illinois v. Gates*, 462 U.S. 213, 243 n.13, (1983). Probable cause does not

---

[3] Florida law provides:

> (1)(a) The unlawful killing of a human being:
> 1. When perpetrated from a premeditated design to effect the death of the person killed or any human being;
> [ . . . . ]
> is murder in the first degree and constitutes a capital felony, punishable as provided in s. 775.082.
> (2) The unlawful killing of a human being, when perpetrated by any act imminently dangerous to another and evincing a depraved mind regardless of human life, although without any premeditated design to effect the death of any particular individual, is murder in the second degree and constitutes a felony of the first degree, punishable by imprisonment for a term of years not exceeding life or as provided in s. 775.082, s. 775.083, or s. 775.084.

Fla. Stat. § 782.04.

require a showing that the allegations are more likely to be true than false. *Texas v. Brown*, 460 U.S. 730, 742 (1983). Instead, probable cause requires only "the existence of a reasonable ground to believe the accused guilty" of the crime charged. *Escobedo v. United States*, 623 F.2d 1098, 1102 (5th Cir. 1980) (internal quotation marks and citation omitted)). The Eleventh Circuit, in the context of an arrest, held that probable cause exists "when the facts, considering the totality of the circumstances and viewed from the perspective of a reasonable officer, establish 'a probability or substantial chance of criminal activity.'" *Washington v. Howard*, 25 F.4th 891, 898 (11th Cir. 2022) (quoting *District of Columbia v. Wesby*, 138 S. Ct. 577, 586 (2018)).

As described above, the certified documents Jamaica submitted in support of MITCHELL's extradition provide ample evidence from which a person of ordinary prudence and caution could entertain a reasonable belief that MITCHELL murdered Rodgers. In particular, Jamaica's submissions include an affidavit from Kristen Palarche, Crown Counsel at the Office of the Director of Public Prosecutions in Kingston, Jamaica, which provides a summary of the evidence against MITCHELL, including the CCTV footage from MITCHELL's home and the anticipated testimony from Scarlett, Badley, Rodgers' father, Rodgers' employer, Spence, Watkis, Johnson, the law enforcement officers who found Rodgers' body and reviewed the CCTV footage from MITCHELL's home, and the forensic pathologist who examined Rodgers' body.

Accordingly, Jamaica's extradition request establishes probable cause that MITCHELL committed the crime for which Jamaica seeks extradition.

**<u>CONCLUSION</u>**

For all these reasons, the United States requests that the Court determine that the submission on behalf of Jamaica is sufficient to sustain the charge of murder under the applicable

Treaty and certify the extradition of MITCHELL for that charge to the Secretary of State for possible surrender to Jamaica.

Respectfully submitted,

JASON A. REDING QUIÑONES
UNITED STATES ATTORNEY

By: */s/ Christopher Killoran*_______
CHRISTOPHER KILLORAN
Assistant United States Attorney
FL Bar No. 27999
500 East Broward Blvd. Suite 700
Fort Lauderdale, FL 33394
Tel. No. (954) 660-5669
Email: christopher.killoran@usdoj.gov

# EXHIBIT 1

DECLARATION OF AMY LINDSAY

I, Amy Lindsay, declare and say as follows:

1. I am an Attorney Adviser in the Office of the Legal Adviser for the Department of State, Washington, D.C. This office has responsibility for extradition requests, and I am charged with the extradition case of Oneil Mitchell. I make the following statements based upon my personal knowledge and upon information made available to me in the performance of my official duties.

2. The relevant and applicable treaty provisions in full force and effect between the United States of America and Jamaica which apply to this case are found in the Extradition Treaty between the Government of the United States and the Government of Jamaica, signed on June 14, 1983, and entered into force July 7, 1991 (the "Treaty"). A copy of the Treaty is attached to this declaration.

3. Pursuant to the provisions of the Treaty, the Embassy of Jamaica submitted Diplomatic Note No. 220/26, dated May 21, 2026, formally requesting the extradition of Oneil Mitchell. A copy of the diplomatic note is attached to this declaration.

4. The Government of the United States of America provides legal representation in the United States courts for Jamaica in its extradition requests, and Jamaica provides legal representation in its courts for extradition requests made by the United States.

5. The offense for which extradition is sought is covered by Article II of the Treaty.

6. The documents submitted by the Embassy of Jamaica in support of its extradition request were certified on May 21, 2026, by Scott Renner, Chargé d' Affaires at the United States Embassy in Kingston, in accordance with Title 18, United States Code, Section 3190. Mr. Renner, at the

time he certified the documents, was the principal diplomatic officer of the United States in Jamaica.

I declare under the penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed in Washington, D.C. on May 29, 2026.

Amy Lindsay

Attachments:

1. Copy of Treaty

2. Copy of Diplomatic Note

TREATIES AND OTHER INTERNATIONAL ACTS SERIES 91-707

# LAW ENFORCEMENT

## Extradition

**Treaty Between the**
**UNITED STATES OF AMERICA**
**and JAMAICA**

Signed at Kingston June 14, 1983

NOTE BY THE DEPARTMENT OF STATE

Pursuant to Public Law 89—497, approved July 8, 1966 (80 Stat. 271; 1 U.S.C. 113)—

". . .the Treaties and Other International Acts Series issued under the authority of the Secretary of State shall be competent evidence . . . of the treaties, international agreements other than treaties, and proclamations by the President of such treaties and international agreements other than treaties, as the case may be, therein contained, in all the courts of law and equity and of maritime jurisdiction, and in all the tribunals and public offices of the United States, and of the several States, without any further proof or authentication thereof."

# JAMAICA

## Law Enforcement: Extradition

*Treaty signed at Kingston June 14, 1983;*
*Transmitted by the President of the United States of America to the Senate April 17, 1984 (Treaty Doc. 98-18, 98th Congress, 2d Session);*
*Reported favorably by the Senate Committee on Foreign Relations June 19, 1984 (Senate Executive Report No. 98-31, 98th Congress, 2d Session);*
*Advice and consent to ratification by the Senate June 28, 1984;*
*Ratified by the President August 17, 1984;*
*Ratified by Jamaica May 31, 1991;*
*Ratifications exchanged at Washington June 7, 1991;*
*Entered into force July 7, 1991.*

# EXTRADITION TREATY BETWEEN THE GOVERNMENT OF THE UNITED STATES OF AMERICA AND THE GOVERNMENT OF JAMAICA

The Government of the United States of America and the Government of Jamaica,

Recalling the Treaty for the Mutual Extradition of Criminals between the United Kingdom and the United States of America concluded in London in 1931;

Noting that both the Government of the United States of America and the Government of Jamaica have continued to apply the terms of that Treaty; and

Desiring to provide for more effective cooperation between the two States in the suppression of crime and, for that purpose, to conclude a new treaty for the extradition of offenders;

Have agreed as follows:

## ARTICLE I

## Obligation to Extradite

(1) The Contracting Parties agree to extradite to each other, subject to the provisions of this Treaty:

(a) persons whom the competent authorities in the Requesting State have charged with an extraditable offence committed within its territory; or

(b) persons who have been convicted in the Requesting State of such an offence and are unlawfully at large.

(2) With respect to an offence committed outside the territory of the Requesting State, the Requested State shall grant extradition, subject to the provisions of this Treaty, if there is jurisdiction under the laws of both States for the punishment of such an offence in corresponding circumstances.

ARTICLE II

Extraditable Offences

(1) An offence shall be an extraditable offence if it is punishable under the laws of both Contracting Parties by imprisonment or other form of detention for a period of more than one year or by any greater punishment.

(2) The following offences shall be extraditable if they meet the requirements of paragraph (1):

(a) conspiring in, attempting to commit, aiding or abetting, assisting, counselling or procuring the commission of, or being an accessory before or after the fact to, an offence described in that paragraph; or

(b) impeding the apprehension or prosecution of a person charged with an offence described in that paragraph.

(3) For the purposes of this Article, an offence shall be an extraditable offence:

(a) whether or not the laws of the Contracting Parties place the offence within the same category of offences or denominate the offence by the same terminology; or

(b) whether or not the offence is one for which United States federal law requires proof of interstate transportation, or use of the mails or of other facilities affecting interstate or foreign commerce, such matters being merely for the purpose of establishing jurisdiction in a United States federal court.

ARTICLE III

Political and Military Offences

(1) Extradition shall not be granted if the offence for which extradition is requested is of a political character.

(2) Extradition shall also not be granted if:

(a) it is established that extradition is requested for political purposes; or

(b) it is established that the request for extradition, though purporting to be on account of the extraditable offence, is in fact made for the purpose of prosecuting or punishing the person sought on account of his race, religion, nationality, or political opinions; or

(c) the person sought is by reason of his race, religion, nationality, or political opinions, likely to be denied a fair trial or punished, detained or restricted in his personal liberty for such reasons.

(3) It shall be the responsibility of the competent authorities of the Requested State to decide any question arising under paragraph (1). However, it shall be the responsibility of the executive authority of the Requested State to decide any question arising under paragraph (2) or (5) except to the extent that the national laws of that State expressly grant such powers to its courts.

(4) Paragraphs (1) and (2) shall not apply to an offence which is extraditable pursuant to a treaty or convention to which both Contracting Parties are parties, the purpose of which is to prevent or repress a specific category of offences, and which imposes on States an obligation either to extradite the person sought or submit the matter to the competent authorities for decision as to prosecution.

(5) Extradition may be refused for offences under military law which are not offences under ordinary criminal law.

ARTICLE IV

Effect of Decision Not to Prosecute

Extradition shall not be precluded by the fact that the competent authorities in the Requested State have decided not to prosecute the person sought for the acts for which extradition is requested or have decided to discontinue any criminal proceedings

which have been initiated against the person sought.

ARTICLE V

Capital Punishment

(1) When the offence for which extratition is requested is punishable by death under the laws of the Requesting State, and the laws of the Requested State do not permit such punishment for that offence, the executive authority of the Requested State may refuse to grant extradition.

(2) In exercising its discretion pursuant to paragraph (1), the executive authority of the Requested State shall give due and sympathetic consideration to any assurance given by the Requesting State, insofar as the laws of the Requesting State permit, that the death penalty will not be carried out.

ARTICLE VI

Lapse of Time

Extradition shall not be granted when prosecution of the offence for which extradition has been sought, or enforcement of the penalty for such an offence, has become barred by lapse of time according to the laws in the Requesting State.

ARTICLE VII

Nationality

(1) Neither Contracting Party shall be bound to deliver up its own nationals but the executive authority of the Requested State shall, if not prevented by the laws of that State, have the power to deliver them up if, in its discretion, it be deemed proper to do so.

(2) Extradition shall not be refused on the ground that the

fugitive is a national of the Requested State if the fugitive is also a national of the Requesting State.

(3) If extradition is not granted for an offence pursuant to paragraph (1), the Requested State shall, if it has jurisdiction over the offence, submit the case to its highest competent authorities for decision as to prosecution, in accordance with the law of that State.

## ARTICLE VIII

## Extradition Procedures and Required Documents

(1) The request for extradition shall be made through the diplomatic channel.

(2) The request for extradition shall be supported by:

(a) documents, statements, or other evidence which describe the identity and probable location of the person sought;

(b) a statement of the facts of the case, including, if possible, the time and location of the offence;

(c) a statement of the provisions of the law describing the essential elements and the designation of the offence for which extradition is requested;

(d) a statement of the provisions of the law prescribing the punishment for the offence; and

(e) a statement of the provisions of the law prescribing any time limit on the prosecution or the execution of punishment for the offence.

(3) A request for extradition relating to a person who is sought

for prosecution shall also be supported by:

(a) a copy of the warrant of arrest issued by a judge or other judicial authority in the Requesting State; and

(b) such evidence as would justify the committal for trial of that person if the offence had been committed in the Requested State.

(4) When the request for extradition relates to a convicted person, in addition to those items required by paragraph (2), it shall be supported by a certificate of conviction or copy of the judgment of conviction rendered by a court in the Requesting State. If the person has been convicted and sentenced, the request for extradition shall also be supported by a statement showing to what extent the sentence has been carried out. If the person has been convicted but not sentenced, the request for extradition shall also be supported by a statement to that effect.

(5) Statements, depositions and other documents transmitted in support of the request for extradition shall be transmitted through the diplomatic channel and shall be admissible if certified or authenticated in such manner as may be required by the law of the Requested State.

## ARTICLE IX

## Additional Information

(1) If the executive authority of the Requested State considers that the information furnished in support of the request for extradition is not sufficient to fulfill the requirements of this Treaty, it

shall notify the Requesting State in order to enable that State to furnish additional information before the request is submitted to a court of the Requested State.

(2) The executive authority may fix a time limit for such information to be furnished.

(3) Nothing in paragraph (1) or (2) shall prevent the executive authority of the requested State from presenting to a court of that State information sought or obtained after submission of the request to the court or after expiration of the time stipulated pursuant to paragraph (2).

## ARTICLE X

## Provisional Arrest

(1) In case of urgency either Contracting Party may request the provisional arrest in accordance with the law of the Requested State of any accused or convicted person pending the request for extradition. Application for provisional arrest shall be made through the diplomatic channel or directly between the Department of Justice in the United States of America and the Minister responsible for extradition in Jamaica.

(2) The application shall contain:

(a) a description of the person sought;

(b) the location of that person if known;

(c) such information as would be necessary to justify the issuance of a warrant of arrest had the offence been committed, or the person sought been convicted, in the territory of the Requested State; and

(d) a statement that a request for extradition of the person sought will follow.

(3) On receipt of such an application, the Requested State shall take the appropriate steps to secure the arrest of the person sought. The Requesting State shall be promptly notified of the result of its application.

(4) A person who is provisionally arrested shall be discharged from custody upon the expiration of sixty (60) days from the date of arrest pursuant to the application for provisional arrest if the executive authority of the Requested State has not received the formal request for extradition and the supporting documents required by Article VIII.

(5) The fact that a person is discharged from custody pursuant to paragraph (4) shall not prejudice the extradition of that person if the extradition request and the supporting documents mentioned in Article VIII are delivered at a later date.

ARTICLE XI

Decision and Surrender

(1) The Requested State shall promptly communicate through the diplomatic channel to the Requesting State its decision on the request for extradition.

(2) If the request for extradition is denied by reason of any statutory or treaty prohibition against extradition, the Requested State shall provide such information as may be available as to the reason for the denial.

(3) If the extradition is granted, the competent authorities of the Contracting Parties shall agree on the time and place of the surrender of the person sought.

(4) If the person sought is not removed from the territory of the Requested State within the time prescribed by the law of that State, that person may be discharged from custody and the Requested State may subsequently refuse extradition for the same offence.

## ARTICLE XII

## Deferred Surrender

If the extradition request is granted in the case of a person who is being prosecuted or is serving a sentence in the territory of the Requested State for a different offence, the Requested State shall, unless its laws otherwise provide, defer the surrender of the person sought until the conclusion of the proceedings against that person or the full execution of any punishment that may be or may have been imposed.

## ARTICLE XIII

## Requests for Extradition Made by Several States

The executive authority of the Requested State, upon receiving requests from the other Contracting Party and from any other State or States for the extradition of the same person, either for the same offence or for different offences, shall determine to which State it will extradite that person.

ARTICLE XIV

Rule of Speciality

(1) A person extradited under this Treaty may only be detained, tried or punished in the Requesting State for the offence for which extradition is granted, or -

(a) for a lesser offence proved by the facts before the court of committal, or in the case of extradition pursuant to Article XV, any lesser offence disclosed by the facts upon which the request is based; or

(b) for an offence committed after the extradition; or

(c) for an offence in respect of which the executive authority of the Requested State, in accordance with its laws, consents to the person's detention, trial or punishment; and for the purposes of this sub-paragraph the Requested State may require the submission of documents mentioned in Article VIII or the written views of the extradited person with respect to the offence concerned, or both; or

(d) if the person -

(i) having left the territory of the Requesting State after his extradition, voluntarily returns to it; or

(ii) being free to leave the territory of the Requesting State after his extradition, does not so leave within

forty-five (45) days after the first day on which he was free to do so.

(2) A person extradited under this Treaty may not be extradited to a third State unless -

(a) the Requested State consents; or

(b) the circumstances are such that he could have been dealt with in the Requesting State pursuant to sub-paragraph (d) of paragraph (1).

ARTICLE XV

Simplified Extradition

If the person sought agrees in writing to extradition after personally being advised by a judge or competent magistrate of his right to further extradition proceedings, the Requested State may grant extradition without formal proceedings. Extradition pursuant to this Article shall be subject to Article XIV.

ARTICLE XVI

Seizure and Surrender of Property

(1) To the extent permitted under the laws in the Requested State all articles, instruments, objects of value, documents or other evidence relating to the offence may be seized and such items may be surrendered upon the granting of the extradition. The items mentioned in this Article may be surrendered even when extradition cannot be effected due to the death, disappearance, or escape of the person sought.

(2) The rights of third parties in such property shall be duly respected.

(3) The Requested State may impose conditions designed to ensure that the rights of third parties are protected and that the property is returned to the Requested State as soon as practicable.

ARTICLE XVII

Expenses and Representation

(1) Expenses related to the transportation of the person sought to the Requesting State shall be paid by that State. All other expenses relating to the apprehension of the person sought and to subsequent proceedings shall be borne by the Requested State. However, expenses which, in the opinion of the Parties, constitute special expenditures shall be borne by the Requesting State.

(2) The Requested State shall also provide for the representation of the Requesting State in any proceedings arising in the Requested State out of a request for extradition.

(3) No pecuniary claim arising out of the arrest, detention, examination and surrender of the person sought under the terms of this Treaty shall be made by the Requested State against the Requesting State.

(4) Paragraph (3) shall not apply to claims arising out of failure of the Requesting State to comply with conditions imposed pursuant to paragraph (3) of Article XVI.

ARTICLE XVIII

Scope of Application

This Treaty shall apply to offences encompassed by Article II committed before as well as after the date this Treaty enters into force if at the time of the act or omission comprising the offence such act or omission constituted an offence under the laws of both States.

ARTICLE XIX

Ratification and Entry into Force

(1) This Treaty shall be subject to ratification; the instruments of ratification shall be exchanged at Washington as soon as possible.

(2) This Treaty shall enter into force thirty (30) days after the exchange of the instruments of ratification.

(3) Upon entry into force of this Treaty, the Extradition Treaty between the United States of America and the United Kingdom signed at London, December 22, 1931, shall cease to have effect between the United States of America and Jamaica. Nevertheless, the 1931 Treaty shall continue to have effect in relation to any request for extradition made before this Treaty enters into force.

ARTICLE XX

Termination

(1) Either Contracting Party may terminate this Treaty at any time by giving written notice to the other Party, and the termination shall be effective six (6) months after the date of receipt of such notice.

(2) Nothing in paragraph (1) shall affect any request for extradition made before the date on which the termination becomes effective.

IN WITNESS WHEREOF, the undersigned, being duly authorized by their respective Governments, have signed this Treaty.

DONE AT KINGSTON, in duplicate, this 14th day of June, 1983.

| | |
|---|---|
| For the Government of the United States of America | For the Government of Jamaica |
| William A. Hewitt | [signature] |
| ............................... | ............................... |
| Ambassador of the United States of America | Minister of National Security and Justice |

wah

*EMBASSY of JAMAICA*
*WASHINGTON*

Ref No. 220/26

The Embassy of Jamaica presents its compliments to the Department of State of the United States of America and has the honour to transmit herewith duly authenticated documents in support of the Government of Jamaica's request for the extradition of Mr. Oneil. Joel Mitchell from the United States.

The Embassy respectfully requests that the Department cause the enclosed documents to be forwarded to the appropriate authorities for their consideration and further action, in accordance with the extradition treaty signed between the Government of Jamaica and the Government of the United States 14th June 1986 and entered into force July 7th, 1991.

The Embassy would be grateful for confirmation of receipt of the enclosed documents and stands ready to provide any additional information or clarification that may be required.

The Embassy of Jamaica avails itself of this opportunity to renew to the Department of State of the United States of America the assurances of its highest consideration.

EMBASSY OF JAMAICA * WASHINGTON D.C. *

United States Department of State
Washington, D.C.
21st May 2026

U.S. Department of State

**CERTIFICATE TO BE ATTACHED TO DOCUMENTARY EVIDENCE ACCOMPANYING REQUISITIONS IN THE UNITED STATES FOR EXTRADITION**

**AMERICAN FOREIGN SERVICE**

Kingston, Jamaica 05-21-2026
Place and Date *(mm-dd-yyyy)*

I, Scott Renner (Name), Chargé d'Affaires (Title)

of the United States of America at Kingston, Jamaica

hereby certify that the annexed papers, being supporting documents

proposed to be used upon an application for the extradition from the United States of America

Oniel Mitchell,

charged with the crime of Murder contrary to The Offences Against the Person Act

alleged to have been committed in Jamaica

are properly and legally authenticated so as to entitle them to be received in evidence for similar purposes by

the tribunals of Jamaica,

as required by Title 18, United States Code, Section 3190.

In witness whereof I hereunto sign my name and cause my seal of office to be affixed

this 21 day of May 2026
Month and Year

[Signature]
Signature

EMBASSY OF THE UNITED STATES OF AMERICA KINGSTON

Scott Renner, Chargé d'Affaires
Type Name and Title of Certifying Officer of the United States of America.

DS-0036
08-2019

Jamaica Foreign Service

...ference No. 8/804/73

The Ministry of Foreign Affairs and Foreign Trade presents its compliments to the Embassy of the United States of America and has the honour to refer to the latter's Note No. 8/804/73, dated 5th December 2025, requesting the formal extradition of Mr. Oneil Joel Mitchell from the United States of America, pursuant to the Extradition Treaty between the Government of the United States of America and the Government of Jamaica, signed on 14th June 1986, and entered into force July 7, 1991 (the Treaty).

The Ministry has the further honour to transmit one (1) original and four (4) copies of the authenticated supporting documents duly signed and certified by the Minister of Justice for certification by the United States Embassy and return for onward transmission to the Jamaican Embassy in Washington D.C. and subsequent delivery to the Department of State.

The Ministry of Foreign Affairs and Foreign Trade avails itself of this opportunity to renew to the Embassy of the United States of America the assurances of its highest consideration.

MINISTRY OF FOREIGN AFFAIRS & FOREIGN TRADE JAMAICA

Embassy of the United States of America

KINGSTON

20th May 2026

# CERTIFICATE OF AUTHENTICATION

**IN THE MATTER OF AN APPLICATION**
**FOR THE EXTRADITION OF ONIEL MITCHELL**
**FROM THE UNITED STATES OF AMERICA**

**I, DELROY H. CHUCK, K.C., MINISTER OF JUSTICE & CONSTITUTIONAL AFFAIRS** for Jamaica do hereby certify:

That the Affidavit of **Kristen Palarche** is the original document which sets out the facts of the case, describes the identity of the person sought, states the provisions of the law describing the essential elements and the designation of the offence for which extradition is required and the prescribed punishment and a statement of the provisions of the law stating that there is no time limit on the prosecution or execution of punishment for the offence, pursuant to the provisions of Article VIII of the Treaty between the Governments of Jamaica and the United States of America.

That the signature of **Kristen Palarche** on the annexed original affidavit is the signature of **Kristen Palarche** being a Crown Counsel for the Island of Jamaica who having been appointed to that office is duly authorized by law to swear affidavits for these purposes.

**DATED THIS** 14th DAY OF MAY 2026.

Delroy Chuck

Delroy H. Chuck, K.C.
Minister of Justice & Constitutional Affairs

MINISTRY OF JUSTICE JAMAICA

# AFFIDAVIT OF KRISTEN PALARCHE IN SUPPORT OF THE REQUEST FOR THE EXTRADITION OF ONIEL MITCHELL

**IN THE MATTER OF THE EXTRADITION ACT 1991**

**AND**

**IN THE MATTER OF THE EXTRADITION TREATY BETWEEN THE GOVERNMENTS OF JAMAICA AND THE UNITED STATES OF AMERICA**

**I KRISTEN PALARCHE,** being duly sworn make oath and say as follows **THAT**: -

1. For the purpose of this Affidavit, my true place of abode and postal address is in care of the Office of the Director of Public Prosecutions, Public Building West, King Street in the parish of Kingston.

2. I, currently hold the position of Crown Counsel.

3. I graduated from the University of the West Indies on or about September 1, 2016, with a Bachelor of Laws (LLB) Degree.

4. I graduated from the Norman Manley Law School on or about September 7th, 2018, with a Certificate of Legal Education (LEC).

5. On or about December 1, 2018, I was admitted to practice as an Attorney-at-Law in the island of Jamaica.

6. From April 3, 2023, to present, I have been employed by the Government of Jamaica, as a Crown Counsel at the Office of the Director of Public Prosecutions.

7. As Crown Counsel, I prosecute criminal matters in the Circuit and Parish Courts, conducting trials and hearings and advising on charges. I have become knowledgeable about the criminal laws and procedures of Jamaica.

8. In the course of my duties, I have become familiar with the charges and evidence in the case of **REX vs. ONIEL MITCHELL o/c OILY.** This prosecution arose from an investigation by Detective Corporal Damian Morgan of the Jamaica Constabulary Force (JCF), which revealed that **ONIEL MITCHELL o/c OILY** committed the offence of Murder, contrary to common law.

9. The Record of the Evidence of this Case against **ONIEL MITCHELL o/c OILY** was prepared by me, and the evidence described herein has been preserved for use in the trial against **ONIEL MITCHELL o/c OILY.** This affidavit does not detail all of the evidence against **ONIEL MITCHELL o/c OILY** that is known to me, but only the evidence necessary to establish a basis for the extradition request. This prosecution arose from an investigation by the Jamaica Constabulary Force, which revealed that on May 27, 2025, **ONIEL MITCHELL o/c OILY,** currently located in the United States of America, unlawfully killed Derricka Rodgers.

**SUMMARY OF THE CASE**

10. On May 26, 2025, Derricka Rodgers sent a voice note to her cousin, Dana Scarlett, stating that Mr **ONIEL MITCHELL o/c OILY** held a firearm to her head and pulled the trigger, though the weapon failed to discharge. On May 27, 2025, the deceased left her home to meet **ONIEL MITCHELL o/c OILY** in May Pen, Clarendon. At approximately 12:00 p.m. that day, she sent a voice note to her mother and confirmed that she was in the company of **ONIEL MITCHELL o/c OILY** in Milk River, Clarendon. The last confirmed sighting of the deceased was on May 27, 2025, between 2:00 p.m. and 3:00 p.m., when her father, Derrick Rodgers, observed her near the May Pen Police Station. Following the disappearance, **ONIEL MITCHELL o/c OILY** is described by his

friends/associates as exhibiting a nervous demeanour, concealing his motor vehicle, and advancing his departure to the United States to the early morning of May 29, 2025. When confronted by his associate, Miss Spence, regarding the disappearance of the deceased, **ONIEL MITCHELL o/c OILY** stated that he did not have time to discuss the issue and expressed an intent to leave where he was. On June 1, 2025, the family of the deceased visited the premises where **ONIEL MITCHELL o/c OILY** resided and observed a freshly cemented sewage pit. Upon this discovery, they alerted the police, and the body of the deceased was subsequently recovered from the pit located on the property. The body of the deceased was wrapped in a sheet and was identified by her father, Mr Derrick Rodgers. Additionally, Mr Derrick Rodgers identified a gold chain belonging to the deceased and a bag containing the deceased's various identification cards. Video footage from the premises was recovered by members of the Jamaica Constabulary Force, and it revealed **ONIEL MITCHELL o/c OILY** removing a large object wrapped in a similar-looking sheet from his Toyota Voxy and placing it into a pit. Based on a post-mortem conducted, the cause of death was determined to be multiple blunt force trauma to the head.

## PROCEDURAL HISTORY OF THE CASE

11. All criminal proceedings in Jamaica are initiated in the Parish Court, whether or not they are felonies or misdemeanours.

12. Murder is an indictable matter which is beyond the jurisdiction of the Parish Court. This means that it is tried in the Supreme Court of Judicature. Indictable matters are initiated in the Parish Court with the laying of a Complaint or Information, which is signed by either a Justice of the Peace or the Clerk of the Courts. Sections 29-33 of the Justices of the Peace Jurisdiction Act speak to the manner of complaint or information in indictable matters. Please find attached hereto a copy of said sections marked **Exhibit KP-1.**

13. The Parish Judge commits the person for trial in the Supreme Court of Judicature in an indictable matter which is beyond his jurisdiction by holding a Committal Proceeding to determine whether or not the evidence is sufficient.

14. In indictable trials in the Supreme Court of Judicature, which take place before a Judge and a Jury, the Indictment is the document filed in Court. Thus, after the Committal Proceedings, if the Director of Public Prosecutions wishes to proceed with the indictable charge, an indictment is caused to be filed in the Supreme Court. It is on the Indictment that the accused is tried in the Supreme Court of Judicature.

15. In the instant request, investigations were carried out by Detective Corporal Damian Morgan of the Milk River Police Station and May Pen CIB located in Clarendon.

16. On the 10th day of June, 2025, a Warrant on Information for the arrest of **ONIEL MITCHELL o/c OILY,** along with the Information being the Complaint of Detective Corporal Damian Morgan, was issued by Mr Andre Pasley, a Justice of the Peace for the parish of Clarendon, for the offence of Murder contrary to common law. This warrant remains valid and executable. Please find attached hereto a copy of the said Warrant on Information, marked **Exhibit KP-2** and a copy of the said Information marked as **Exhibit KP-3.**

## THE CHARGES AND PERTINENT JAMAICAN LAW

17. The Information charges that **ONIEL MITCHELL o/c OILY** committed the following offence: -

**Murder**

**"On May 27, 2025, Oniel Mitchell o/c Oily in the parish of Clarendon did unlawfully kill Derricka Rodgers."**

18. Murder is an offence for which Jamaica may extradite under its law.

19. Jamaica requests the extradition of **ONIEL MITCHELL o/c OILY,** for the offence of murder, which is contrary to common law. The offence is punishable under Jamaican law by more than one (1) year of imprisonment.

20. The offence of Murder carries a maximum penalty of death or life imprisonment with a mandatory minimum sentence of fifteen (15) years. Please find attached hereto a copy of section 3(1) of the Offences Against the Person Act marked **Exhibit KP-4.**

## OFFENCE

21. Under Jamaican law, Murder is committed when an individual kills another without lawful justification.

22. The offence of Murder is triable only in the Supreme Court of Judicature before a Judge and a Jury or before a single Judge sitting alone.

23. To satisfy its burden of proof and convict **ONIEL MITCHELL o/c OILY** for the offence of Murder, the prosecution must establish at trial each of the following essential elements beyond a reasonable doubt: -

I. That Derricka Rodgers was killed;
II. That it was **ONIEL MITCHELL o/c OILY** who killed Derricka Rodgers;
III. That he did so without lawful justification;

24. At the conclusion of the prosecution's case, the question for the Judge is whether, looked at critically and in the round, the jury could safely convict. The question for the jury is whether the facts as they find them to be sufficient to drive them to the conclusion, so that they are sure, beyond a reasonable doubt, that the accused is guilty.

## SUMMARY OF THE EVIDENCE

**Ms Dana Scarlett** is expected to testify as follows;

25. On the 26th day of May, 2025, at about 7:50 a.m., Derricka Rodgers (herinafter referred to as the deceased) sent a voice note to Ms Scarlett via WhatsApp stating that "Oily" took out a firearm, placed it to her head, and pulled the trigger. The firearm made a clicking sound and did not fire. Ms Scarlett will testify that the deceased indicated that "Oily" threatened her with the firearm.

26. Ms Scarlett will give evidence that on the 27th day of May, 2025, at about 8:30 a.m., the deceased visited her house. The deceased informed Ms Scarlett that she was going to meet "Oily" in May Pen, Clarendon, to collect money from him. Ms Scarlett will further testify that the deceased stated that she intended to spend the remainder of the day with "Oily". The deceased left Ms Scarlett's premises at approximately 10:15 a.m and this was the last time Miss Scarlett saw or spoke with the deceased.

**Mr Kevin Badley** is expected to testify as follows:

27. Mr Kevin Badley will testify that prior to the 27th day of May, 2025, he knew both the deceased and **Mr ONIEL MITCHELL, o/c Oily**, and knew that they had been in an intimate relationship since January 2025.

28. Mr Badley will state that the mother of the deceased, "Cameal", received a voice note from the deceased on the 27th day of May, 2025, sometime after 12:00 p.m., which he heard. In that voice note, the deceased stated that she was with "Oiley" and was at Milk River.

29. Mr Badley will testify that throughout the afternoon and evening of the 27th day of May, 2025, he, along with other family members, attempted to contact the deceased; however, they were not successful.

30. Mr Badley will testify that the deceased did not return home on that date, and none of her family members was aware of her whereabouts.

31. On the 28th day of May, 2025, at about 11:30 am, Mr Badley reported the deceased missing at the Milk River Police Station.

**Mr Everald Morris** is expected to testify as follows:

32. On the 27th day of May, 2025, at about 7:31 a.m., Mr Morris, the deceased's employer, received a telephone call from the deceased regarding her attendance at the office in May Pen, Clarendon. He advised the deceased that he was in Ocho Rios and that she was not required to report to the office unless she chose to attend. The deceased did not return to work that day or at any point afterwards.

**Mr Derrick Rodgers** is expected to testify as follows;

33. On the 27th day of May, 2025, between the hours of 2:00 p.m. and 3:00 p.m., he last observed his daughter, Derricka Rodgers, across from the May Pen Police Station. Mr Rodgers subsequently attempted to contact the deceased without success.

34. Mr Rodgers will testify that he later learned that **ONIEL MITCHELL, o/c OILY** had left Jamaica, and this aroused his suspicions. This information led the family to search the area where **ONIEL MITCHELL, o/c OILY** lived. On the 1st day of June 2025, he went to a house in Deeside District in Milk River, Clarendon, which was occupied by **ONIEL MITCHELL o/c OILY.**

35. On the same date, Mr Rodgers noticed a sewage pit within the yard where **ONIEL MITCHELL o/c OILY** resided. The sewage pit looked like it had been

tampered with, as the surrounding concrete was broken and clearly disturbed. Based on this, he contacted the police, who then arrived at the property.

36. Sergeant K. Brown and Constable Tulloch arrived at the scene, where Mr Rodgers pointed out the sewage pit. Upon opening the sewage pit, they discovered a body wrapped in a grey sheet. A garbage bag was also recovered from the pit, containing a National ID, Passport, TRN, Food Handler's Permit, and NIS card, all belonging to Derricka Rodgers.

37. Mr Rodgers will give evidence that he positively identified the body as that of his daughter, Derricka Rodgers. He further confirmed her identity by recognising a necklace she was wearing, which featured a pendant with the letter "D."

38. On the 21st day of June 2025, Mr Rodgers attended the post-mortem examination at Archer's Funeral Home in St. Catherine. During the examination, conducted by pathologist Dr. Fearon, he formally identified the body as that of his daughter, Derricka Rodgers.

**Sergeant Georgia Brown** is expected to testify as follows:

39. On the 1st day of June 2025, the scene was processed, and the body of the deceased was removed to the May Pen Hospital, where it was pronounced dead.

**Dr Ransford Fearon** is expected to testify as follows:

40. Dr Fearon is a forensic pathologist employed at the Institute of Forensic Science and Legal Medicine. He will testify that he conducted the post-mortem examination on the body of Derricka Rodgers on the 21st day of June 2025. The examination concluded that the cause of death was multiple blunt force trauma to the head, and the body was identified by Derrick Rodgers as that of his daughter.

**Mr Hugh Watkis** is expected to testify as follows:

41. Mr Watkis is the caretaker of the premises located at Deeside District. He knows a man called "Oily,". He will state that **ONIEL MITCHELL o/c OILY** was in possession of the keys to the premises and had been a resident there for more than one year preceding the deceased's disappearance.

**Mr Kemar Brown** is expected to testify as follows:

42. He installed the cameras at the premises where the deceased's body was found, and the cameras were in working condition.

**Detective Corporal Damian Morgan** is expected to testify as follows:

43. A CCTV system was attached to the house where the deceased's body was found and accessed. Footage was retrieved from the system and was submitted to the Communication Forensics and Cybercrime Division (CFCD) of the Jamaican Constabulary Force for analysis. The footage was extracted. Detective Corporal Morgan watched the video and will give evidence that it shows the following: a black motor vehicle driving onto the premises; **ONIEL MITCHELL, o/c OILY,** the driver, the only person in the vehicle and the only person on the property within the visible area. He parks his vehicle next to what appears to be a cemented sewage pit. He removed the cover of the pit. Throws a black bag into the pit and then struggles to remove a large, misshapen object covered by a grey sheet from the vehicle. He eventually retrieves the object from the vehicle and places it in the pit. He then covers the pit and removes the debris from the pit. He leaves and returns with a bucket of brown material, having the appearance of cement and begins to wipe the brown material around the sewage pit that he previously placed on the sewage pit. He then leaves the premises in the said black motor vehicle.

44. On the 16th day of April 2026, Mr Clement Johnson attended the May Pen Police Station, where he viewed portions of the video which was extracted as well as still images taken from the video in the presence of the investigating officer, Mr Johnson identified the person depicted in the video and images as **ONIEL MITCHELL o/c OILY**, being the same person referred to in the statements he previously gave to the police. Detective Corporal Morgan has identified the individual depicted in the aforementioned video as the same person depicted in exhibits KP-5 & KP-6 which are exhibited below.

45. On the 13th day of May 2026, Mr Clement Johnson visited the May Pen Police station, where he identified two photographs as depicting ONIEL MITCHELL o/c OILY and as the same person he spoke with on the 28th day of May and on the 29th day of May 2025, as described in paragraphs 46 to 48.

**Mr Clement Johnson** is expected to testify as follows:

46. On the 28th day of May, 2025, **ONIEL MITCHELL o/c OILY** informed him that the police from Milk River had contacted him in relation to a missing female. **ONIEL MITCHELL o/c OILY** claimed he had dropped her off in May Pen, but Mr Johnson observed that **ONIEL MITCHELL o/c OILY** appeared visibly worried and anxious to flee the country.

47. Mr Johnson will testify that **ONIEL MITCHELL o/c OILY** originally showed him a flight itinerary for Sunday, June 1, 2025 but then moved the departure up to the early morning of Thursday, May 29, 2025.

48. On Thursday, May 29, 2025, at approximately 3:00 a.m., **ONIEL MITCHELL o/c OILY** arrived at Mr Johnson's house to be taken to the airport. During the drive, **ONIEL MITCHELL o/c OILY** was unusually quiet and struggled to stay on the road. Due to his strange behaviour, Mr Johnson eventually took over the

driving. Mr Johnson later discovered that the original flight itinerary for the 1st day of June 2025 had been deleted from his phone.

49. Mr Clement Johnson will testify that on the 16th day of April 2026, he attended the May Pen Police Station, where he viewed portions of the video as well as still images taken from the video in the presence of the investigating officer. Mr Johnson identified the person depicted in the video and images as **ONIEL MITCHELL o/c OILY**, being the same person referred to in the statements he previously gave to the police.

50. On the 13th day of May 2026, Clement Johnson visited the May Pen Police station, where he identified two photographs as depicting **ONIEL MITCHELL o/c OILY** and as the same person he spoke with on the 28th day of May and on the 29th day of May 2025, as described in paragraphs 46 to 48. Please find attached hereto the photographs of **ONIEL MITCHELL o/c OILY**, marked **Exhibit KP-5** and **KP-6.**

**Miss Sheryll Spence** is expected to testify as follows:

51. Miss Spence will testify that she has a close relationship with **ONIEL MITCHELL o/c OILY.** Miss Spence heard that Derricka Rodgers was missing and that **ONIEL MITCHELL o/c OILY** was the last person to see her. She will testify that on the 29th day of May 2025 at about 8:00 p.m., she called **ONIEL MITCHELL o/c OILY** and advised him that he is heavily implicated in the disappearance and that he was to get a lawyer to clear his name. **ONIEL MITCHELL o/c OILY** replied that he did not have time for a lawyer and was already planning to move from his current location.

52. The Crown intends to rely on the statements of Derrick Rodgers, Kevin Badley, Clement Johnson, Everold Alex Morris, Dana Scarlett, Hugh Clive

Watkis, Sheryll Spencer, Dr Ransford Fearon, Kemar Brown, Detective Corporal Damian Morgan, and Sergeant Georgia Brown to mount its case.

53. I have thoroughly reviewed the statements of Derrick Rodgers, Kevin Badley, Clement Johnson, Everold Alex Morris, Dana Scarlett, Hugh Clive Watkis, Sheryll Spencer, Dr Ransford Fearon, Kemar Brown, Detective Corporal Damian Morgan and Sergeant Georgia Brown and attest that this evidence indicates that **ONIEL MITCHELL o/c OILY** is guilty of the offence charged in the Warrant on Information.

**STATUTE OF LIMITATIONS**

54. There is no statute of limitations on the institution of proceedings by the prosecution for the offence of Murder in Jamaica.

**ARREST OF FUGITIVE**

55. **ONIEL MITCHELL o/c OILY** was arrested in the United States on March 25, 2026, following a provisional arrest request. Mr Clement Johnson has identified the individual depicted in **Exhibit KP-5 and KP-6** as **ONIEL MITCHELL o/c OILY,** whose criminal conduct is described herein.

**DESCRIPTION OF FUGITIVE AND IDENTIFICATION OF FUGITIVE**

56. **ONIEL MITCHELL o/c OILY** is of dark complexion, approximately 6ft 2 inches and stout built. His date of birth is November 2, 1996.

**CONCLUSION**

57. I have attached to this Affidavit the following documents that establish proof of **ONIEL MITCHELL o/c OILY** in criminal activity in violation of the laws of Jamaica, as alleged in the Warrant on information.

I. **Exhibit KP-1** is a copy of sections 29-33 of the Justices of the Peace (Jurisdiction) Act.

II. **Exhibit KP-2** is a copy of the Warrant on Information and Information issued on 10th day of June, 2025, naming **ONIEL MITCHELL o/c OILY** as a defendant.

III. **Exhibit KP-3** is a copy of the Information issued on 10th day of June, 2025, naming **ONIEL MITCHELL o/c OILY** as a defendant.

IV. **Exhibit KP-4** is a copy of section 3(1) of the Offences Against the Person Act.

V. **Exhibit KP-5** is a copy of the photograph of **ONIEL MITCHELL o/c OILY**, which was positively identified by Mr Clement Johnson on the 13th day of May 2026.

VI. **Exhibit KP-6** is a copy of the photograph of **ONIEL MITCHELL o/c OILY**, which was positively identified by Mr Clement Johnson on the 13th day of May 2026.

SWORN TO by the said )
**KRISTEN PALARCHE** )
at The Office of the Director of Public )
Prosecutions )
On the 14th day of May 2026 )
Before me: **RICARDO GREENWOOD** )
)
)

**KRISTEN PALARCHE**

**JUSTICE OF THE PEACE FOR THE PARISH OF KINGSTON**

Ricardo A. Greenwood
Justice of the Peace
Jamaica
B01727

# EXHIBIT KP-1

# THE JUSTICES OF THE PEACE JURISDICTION ACT

## ARRANGEMENT OF SECTIONS


1. Short title.

PART I. *Summary Convictions and Orders*

2. Power to issue summons.

3. If summons not obeyed Justice may issue warrant.

4. Provisions as to warrant.

5. Description of property in information, *etc.*

5A. Special summary jurisdiction of Justices in respect of certain enactments.

6. Accessories.

7. Provision where order for payment of money.

8. Informations for offences punishable on summary conviction.

9. Manner of making complaint or laying information.

When warrant issued in first instance, information to be on oath.

Complaints and informations to embrace one matter only.

10. Limitation of time for complaints and informations.

11. As to hearing of complaints or informations.

12. Defendant not appearing course of proceeding to be observed.

Defendant appearing, and complainant or informant not, what is to be done.

Defendant failing to reappear.

If both parties appear, Justice to hear and determine case.

13. Proceedings at the hearing of complaints or informations.

14. Competency of witnesses.

15. Power to adjourn and course of proceeding upon adjournment.

16. Form of convictions and orders.

When minute of order to be served on defendant.




EXT_MITCHELL_000039

17. Costs.

18. Power to issue warrant of distress.

When defendant may be committed in first instance.

19. Justice after issuing warrant of distress may suffer defendant to go at large, *etc.*

20. In default of distress Justice may commit defendant to prison.

21. Cases where Act provides no remedy in default of distress.

22. Power of Justice to commit in first instance in certain cases.

23. Power to Justice to commit where the conviction is not for a penalty, nor the order for payment of money, and the punishment, *etc.*

24. Imprisonment for second offence to commence at expiration of that for previous offence.

25. Information dismissed, costs may be recovered from prosecutor, *etc.*

26. Defendant may tender payment to constable or gaoler.

27. In summary proceedings one Justice may issue summons or warrant, etc., and, after conviction or order, may issue warrant of distress.

28. Forms in Schedule relating to proceedings under Part I.

PART II. *Committal Proceedings*

*Indictable Offences*

29. When Justice may cause party to be brought before him.

30. Power to Justice to issue warrants on a Sunday.

31. When information in writing necessary.

32. Procedure to compel attendance of person charged.

33. Warrant to apprehend.

Defects in substance or form of warrant.

34.
35.
36. } *Repealed by Act 24/2013, 2nd. Sch.*
37.
38.

39. Power to remand, *etc.*




[The inclusion of this page is authorized by L.N. 143A/2021]

Power to Justices in certain cases to defer examination for fourteen days.

Remand not exceeding three days.

Power to remand accused person limited to certain cases.

40. Appearance of accused in parish other than that where offence charged to have been committed.

41. Bail.

42. Warrant of deliverance.

43.
44. } *Repealed by Act 24/2013, 2nd. Sch.*
45.

46. Forms in Schedule, numbered (15) to (26).

PART III. *General Provisions*

47. Power to summon witnesses.

48. Power of Justices to order production of documents.

49. Provision to execute warrant in any parish.

50. Power to bail witnesses arrested under warrants.

51. Subpoena, summons or warrant issued in one parish may be served or executed in another.

52. Bail may be taken in any parish in which party apprehended.

53. Justice for two parishes may act for one whilst residing in the other.

54. Part I to extend to later enactments giving summary jurisdiction to Justices.

55. Forms relating to proceedings under Part I.

56. Person interested in execution of distress warrant may defend action brought against constable for executing it.

57. Enforcement for fine.

58. Pecuniary amends to complainant.

59. Imprisonment to run from date of capture.

60. Stamp duty on summons.

61. Power to adjourn.

62. Bringing up person imprisoned to answer further charge.



EXT_MITCHELL_000041

63. Certain process shortened.

64. Form of documents in criminal proceedings before Justices.

65. Fees payable. Scale of Fees.

66. Power of Justices to remit, excuse or postpone payment of fees on criminal process.

67. Power to impose fine instead of imprisonment.

68. Things court may do on making order for payment.

69. Court may order person adjudged to be searched.

Person executing warrant may seize money found on person adjudged.

70. When court may revoke term of imprisonment.

71. Minister may make rules.

72. Enforcement of recognizance on non-appearance.

PART IV. *Stipendiary Justices*

73. Governor-General may appoint Stipendiary Justice, each with power of two Justices.

PART V. *Small Penalties Recovery*

74. Interpretation of penalty.

75. Limit of imprisonment in relation to penalties.

76. Applicable to all enactments imposing such penalties.

77. Not to Revenue penalties.

PART VI. *Protected from Vexatious Proceedings*

78. Form of action against Justice.

79. Actions for acts done without jurisdiction, *etc.*

80. Warrant granted by one Justice upon conviction by another.

81. Justice not liable to action for what ordered to do.

82. No action against Justice for defect in conviction affirmed on appeal.

83. Actions brought against provisions of Act may be set aside.

84. Damages.

SCHEDULE

more Justices, such Justices must be present and acting together during the whole of the hearing and determination of the case.

Forms in First Schedule relating to proceedings under Part I. 31/1995 S. 3.

**28.** The several forms in the First Schedule relating to proceedings under this Part or forms to the like effect shall be deemed good and valid and sufficient in law; and it shall not be necessary to the validity thereof that the same shall be, or purport to be, made under seal.

24/2013 2nd Sch.

## PART II. *Committal Proceedings*

### *Indictable Offences*

When Justice may cause party to be brought before him. First Schedule. Form (15). 31/1995 S. 3.

**29.** In all cases where a charge or complaint (according to Form (15) in the First Schedule), shall be made before any one or more of Her Majesty's Justices of the Peace for any parish within this Island that any person has committed, or is suspected to have committed, any treason, felony, or indictable misdemeanour or other indictable offence whatsoever within the limits of the jurisdiction of such Justice or Justices or that any person guilty or suspected to be guilty, of having committed any such crime or offence elsewhere out of the jurisdiction of such Justice or Justices, is residing or being, or is suspected to reside or be, within the limits of the jurisdiction of such Justice or Justices, then and in every such case, if the person so charged or complained against shall not then be in custody, it shall be lawful for such Justice or Justices to issue his or their warrant (according to Form (16) in the First Schedule), to apprehend such person, and to cause him to be brought before such Justice or Justices or any other Justice or Justices for the same parish, to be dealt with according to law:

First Schedule Form (16). 31/1995 S. 3. 24/2013 2nd Sch.

Provided always, that in all cases it shall be lawful for such Justice or Justices to whom such charge or complaint shall be preferred, if he or they shall so think fit, instead


EXT_MITCHELL_000043

of issuing in the first instance his or their warrant to apprehend the person so charged or complained against to issue his or their summons (according to Form (17) in the First Schedule), directed to such person, requiring him to appear before the said Justice or Justices at a time and place to be therein mentioned, or before such other Justice or Justices of the said parish as may then be there; and if, after being served with such summons in manner hereinafter mentioned, he shall fail to appear at such time and place in obedience to such summons, then and in every such case the said Justice or Justices, or any other Justice or Justices for the said parish, may issue his or their warrant (according to Form (18) in the First Schedule), to apprehend such person so charged or complained against and cause such person to be brought before him or them, or before some other Justice or Justices for the said parish, to be dealt with according to law:

First Schedule Form (17). 31/1995 S. 3.

First Schedule Form (18). 31/1995 S. 3. 24/2013 2nd Sch.

Provided, nevertheless, that nothing herein contained shall prevent any Justice or Justices from issuing the warrant hereinbefore first-mentioned at any time before or after the time mentioned in such summons for the appearance of the said accused party.

Power to Justice to issue warrants on a Sunday.

**30.** It shall be lawful for any Justice or Justices to grant or issue any warrant as aforesaid, or any search warrant, on a Sunday as well as on any other day.

When information in writing necessary.

**31.** In all cases where a charge or complaint for any indictable offence shall be made before such Justice or Justices as aforesaid, if it be intended to issue a warrant in the first instance against the party or parties so charged, a written information and complaint thereof (according to Form (15) in the First Schedule), on the oath or affirmation of the informant, or of some witnesses in that behalf, shall be laid before such Justice or Justices:

First Schedule Form (15) 31/1995 S. 3.

Provided always, that in all cases where it is intended to issue a summons instead of a warrant in the first instance, it shall not be necessary that such information and complaint shall be in writing, or be sworn to or affirmed in manner aforesaid, but in every such case such information and complaint may be by parole merely, and without any oath or affirmation whatsoever to support or substantiate the same:

24/2013
2nd Sch.

Provided also, that no objection shall be taken or allowed to any such information or complaint for any alleged defect therein in substance, or in form, or for any variance between it and the evidence adduced on the part of the prosecution.

Procedure to compel attendance of person charged.

First Schedule Form (17). 31/1995 S. 3.

**32.** Upon such information and complaint being so laid as aforesaid, the Justice or Justices receiving the same may, if he or they shall think fit, issue his or their summons or warrant respectively as, hereinbefore is directed, to cause the person charged as aforesaid to be and appear before him or them, or any other Justice or Justices for the said parish, to be dealt with according to law; and every such summons (according to Form (17) in the First Schedule) shall be directed to the party so charged in and by such information, and shall state shortly the matter of such information, and shall require the party to whom it is so directed to be and appear at a certain time and place therein mentioned before the Justice who shall issue such summons, or before such other Justice or Justices of the

said parish as may then be there, to be dealt with according to law; and every such summons shall be served by a constable or other peace officer upon the person to whom it is so directed, by delivering the same to the party personally, or, if he cannot conveniently be met with, then by leaving the same with some person for him at his last or most usual place of abode; and the constable or other peace officer who shall have served the same in manner aforesaid shall attend at the time and place, and before the Justices in the said summons mentioned, to depose, if necessary, to the service of such summons; and if the person so served shall not be and appear before the Justice or Justices at the time and place mentioned in such summons in obedience to the same, then it shall be lawful for such Justice or Justices to issue his or their warrant (according to Form (18) in the First Schedule), for apprehending the party so summoned, and bringing him before such Justice or Justices, or some other Justice or Justices for the said parish, to be dealt with according to law:

24/2013 2nd Sch.

First Schedule Form (18). 31/1995 S. 3. 24/2013 2nd Sch.

Provided always, that no objection shall be taken or allowed to any such summons or warrant for any alleged defect therein in substance or in form, or for any variance between it and the evidence adduced on the part of the prosecution.

24/2013 2nd Sch.

**33.** Every warrant (according to Form (18) in the First Schedule) hereafter to be issued by any Justice or Justices to apprehend any person charged with any indictable offence shall be under the hand or hands of the Justice or Justices issuing the same, and may be directed either to any

Warrant to apprehend. First Schedule Form (18). 31/1995 S. 3.

constable or other person by name, or generally to the constable of the parish within which the same is to be executed, without naming him; or to such constable, and all other constables or peace officers in the parish within which the Justice or Justices issuing such warrant has or have jurisdiction; or generally to all the constables or peace officers within such last-mentioned parish; and it shall state shortly the offence on which it is founded, and shall name or otherwise describe the offender, and it shall order the person or persons to whom it is directed to apprehend the offender, and bring him before the Justice or Justices issuing the said warrant, or before some other Justice or Justices for the said parish, to be dealt with according to law; and it shall not be necessary to make such warrant returnable at any particular time, but the same may remain in force until it shall be executed:

24/2013 2nd Sch.

Defects in substance or form of warrant. 24/2013 2nd Sch.

Provided always, that no objection shall be taken or allowed to any such warrant for any defect therein in substance or in form, or for any variance between it and the evidence adduced on the part of the prosecution.

24/2013 2nd Sch.

**34.** [*Repealed by Act 24/2013, 2nd Sch.*].

24/2013 2nd Sch.

**35.** [*Repealed by Act 24/2013, 2nd Sch.*].

# EXHIBIT KP-2

**PETTY SESSIONS – (Form G)** **Warrant on Information**

**JAMAICA SS.**

Parish of **Clarendon**

To the Constables of the **J.C.F** and to all other Peace

Officers in the Parish of **Clarendon**

Whereas information hath this day been laid before the undersigned, one of his Majesty's Justices Of the Peace in and for the said parish of **Clarendon**

For that **Oneil Mitchell o/c "Oily"** of the said parish, to wit, on the **10th** day of **June** in the year of our Lord **Two Thousand and Twenty Five**

At the said parish and within my jurisdiction

Did unlawfully kill **Derricka Rodgers** contrary to common law

On oath being now made before me, substantiating the matter of such information.

THESE are therefore to command you in his Majesty's name, forthwith to apprehend the said and to bring him before some one or more of his Majesty's Justices of the Peace in and for the said parish to answer to the information and be further dealt with according to Law.

Given under my hand this **10th** day of **June** in the year of our Lord **Two Thousand and Twenty Five** in the parish of **Clarendon for the aforesaid Oneil Mitchell o/c "Oily"**

[signature]
10/6/2025

10.6.28

In the May Pen Parish Court of **Clarendon**

**Petty Sessions**

| | |
|---|---|
| **REX**<br>Vs<br>**Oneil Mitchell o/c "Oily"** | Warrant to apprehend |

**For Murder**

# EXHIBIT KP-3

# INFORMATION

Parish of Clarendon

The information and Complaint of **#9457 Det. Cpl. Damian Morgan**

Of the Parish of Clarendon made and taken upon oath before the

Undersigned this 10th day of June the year of Our Lord Two

Thousand and Twenty Five who saith that on **Tuesday**

The **27th** day of **May** in the year **2025**

Aforesaid one **Oneil Mitchell o/c "Oily"** of the said Parish

Of Clarendon with force **committed at Deeside District Milk River Clarendon**

And within the jurisdiction

**Did Murder Derricka Rodgers**

**CONTRARY TO COMMON-LAW**

Against the form and the Statute in such case made and provided and against the Peace of Our

Sovereign King and his crown and Dignity, and there upon the said Complainant prays

That the said **Oneil Mitchell o/c "Oily"** Defendant may be made to answer upon the said Complaint according to law.

Taken and sworn to before me at May Pen

In the Parish of Clarendon this 10 day of June

Two Thousand and Twenty Five

Pasley Audric Pasley

*Justice of the Peace or Clerk of the Courts*

*For the Parish of*

10/6/2025

# EXHIBIT KP-4

# THE OFFENCES AGAINST THE PERSON ACT

## ARRANGEMENT OF SECTIONS

1. Short title.

*Homicide*

2. Murder.
3. Sentence for murder.
Sentence of death not to be passed on pregnant woman.
Procedure where woman convicted of capital offence alleges she is pregnant.
3A. Procedure regarding murder charge.
3B. [*Repealed by Act 1 of 2005.*]
3C. Provisions as to appeals in relation to repeated and multiple murders.
3D. Provisions as to procedure regarding two or more murders tried together.
4. Abolition of "constructive malice".
5. Persons suffering from diminished responsibility.
6. Provocation.
7. Suicide pact.
8. Conspiring or soliciting to commit murder.
9. Manslaughter.
10. Excusable homicide.
11. Petit treason.
12. Provision for trial of certain cases of murder or manslaughter.

*Attempts to Murder*

13. Administering poison, or wounding with intent to murder.
14. Destroying or damaging building with intent to murder.
15. Setting fire to ship, etc., with intent to murder.
16. Attempting to administer poison, etc., with intent to murder.
17. By other means attempting to commit murder.

*Letters Threatening to Murder*

18. Letters threatening to murder.

*Use of Audio, Visual or Audiovisual Communication to Promote Criminal Activity*

18A. Use of audio, visual or audiovisual communication to promote criminal activity

*Acts Causing or Tending to Cause Danger to Life, or Bodily Harm*

19. Preventing person endeavouring to save his life in shipwreck.
20. Shooting or attempting to shoot or wounding with intent to do grievous bodily harm.
21. What shall be deemed loaded arms.
22. Unlawful wounding.
23. Attempting to choke, etc., in order to commit indictable offence.
24. Administering drug with intent to commit indictable offence.
25. Administering poison so as to endanger life or inflict grievous bodily harm.
26. Administering poison with intent to injure or annoy.
27. Jury may acquit of felony, and find guilty of misdemeanour.
28. Abandoning or exposing child whereby life endangered.
29. Causing bodily injury by explosion of gunpowder.
30. Causing gunpowder to explode, etc., with intent to do grievous bodily harm.
31. Placing wood on railway, etc., with intent to endanger safety of passengers.
32. Doing anything to endanger safety of passengers on railway.
33. Genocide.

*Assaults*

34. Obstructing clergyman in the performance of his duties.
35. Assaulting magistrate when preserving wreck.
36. Assault with intent to commit felony, or on constable, etc.
37. Hindering seaman from working at his trade, etc.
38. Using violence to deter person from buying or selling.
39. Summary jurisdiction to try common assaults.
40. Aggravated assaults on women or children.
41. Justices may dismiss complaint, certifying dismissal.
42. Certificate or conviction to be a bar to further proceedings.
43. Punishment for common and aggravated assaults.
44.
45.
46. [*Repealed by Act 12 of 2009.*]
47.
48.

49.
50.
51. [*Repealed by Act 12 of 2009.*]
52.
53.

54.
55.
56. [*Repealed by Act 12 of 2009.*]
57.
58.

59.
60.
61. [*Repealed by Act 12 of 2009.*]
62.
63.

64.
65.
66. [*Repealed by Act 12 of 2009.*]
67.

*Suppression of Brothels*

68. Search warrants.

*Child Stealing*

69. Child stealing.
70. Kidnapping.

*Bigamy*

71. Bigamy.
Provision as to evidence.

*Attempts to Procure Abortion*

72. Administering drugs or using instruments to procure abortion.
73. Procuring drugs, etc., to procure abortion.

*Concealing the Birth of a Child*

74. Concealment of birth.

*Infanticide*

75. Offence of infanticide.

*Unnatural Offences*

76. Unnatural crime.
77. Attempt.

*Proof of Carnal Knowledge*

78. Proof of carnal knowledge.

*Outrages on Decency*

79. Outrages on decency.

*Other Matters*

80. Apprehension without warrant.
81. Punishment of principals in second degree and accessories.
82. Fines and sureties for good behaviour.
83. Conviction not to be quashed for want of form, etc.
84. Costs on prosecution for assault.
85. Recovery of costs by distress.

# THE OFFENCES AGAINST THE PERSON ACT

Cap. 268. Laws 43 of 1958, 15 of 1962 S. 35, Sch. Acts 42 of 1963 S. 2. 33 of 1967, 44 of 1968, 42 of 1969 3rd Sch., 9 of 1972 Sch., 34 of 1973, 1 of 1979 1st Sch., 30 of 1988, 14 of 1992, 31 of 1995 S. 4, 1 of 2005, 3 of 2006, 12 of 2009 S. 42. 18 of 2010, 3 of 2014 3rd. Sch.

*[1864.]*

1\. This Act may be cited as the Offences against the Person Act. Short title.

*Homicide*

**2.**—(1) Subject to subsection (3), every person to whom section 3(1A) applies or who is convicted of murder committed in any of the following circumstances shall be sentenced in accordance with section 3(1)(*a*), that is to say— Murder. 14/1992 S. 2. 1/2005 S. 2(*a*)(*b*).

(*a*) any murder— 3/2006 S. 2(*a*).

(i) committed by a person if, in the course or furtherance of, arising out of, or ancillary to, that murder, the person commits an offence referred to in subsection (1A); or

(ii) committed by a person in the course or furtherance of, arising out of, or ancillary to, an offence referred to in subsection (1A),

whether or not the individual murdered was an individual that the offender intended to murder in committing the offence;

(*b*) the murder of—

(i) a member of the security forces acting in the execution of his duties or of a person assisting a member so acting;

(ii) a correctional officer acting in the execution of his duties or of a person assisting a correctional officer so acting;

(iii) a judicial officer acting in the execution of his duties; or

(iv) any person acting in the execution of his duties, being a person who, for the purpose of carrying out those duties, is vested under the provisions of any law in force for the time being with the same powers, authorities and privileges as are given by law to members of the Jamaica Constabulary Force,

or the murder of any such member of the security forces, correctional officer, judicial officer or person for any reason directly attributable to the nature of his occupation;

(*c*) the murder of any person for any reason directly attributable to—

(i) the status of that person as a witness or party in a pending or concluded civil cause or matter or in any criminal proceedings; or

(ii) the service or past service of that person as a juror in any criminal trial;

(*d*) the murder of a Justice of the Peace acting in the execution of his judicial functions;

(*e*) any murder committed pursuant to an arrangement whereby money or anything of value—

(i) passes or is intended to pass from one person to another or to a third party at the request or direction of that other person; or

(ii) is promised by one person to another or to a third person at the request or direction of that other person,

as consideration for that other person causing or assisting in causing the death of any person or counselling or procuring any person to do any act causing or assisting in causing that death;

(*f*) any murder committed by a person in the course or furtherance of an act involving the use of violence by that person which, by reason of its nature and extent, is calculated to create a state of fear in the public or any section of the public.

(1A) For the purposes of subsection (1)(*a*), the offences referred to in this subsection are— 3/2006 S.2(b).

(*a*) burglary or housebreaking;

(*b*) arson in relation to a dwelling house;

(*c*) robbery; or

(*d*) any sexual offence.

(2) Subject to subsection (3), every person convicted of murder other than a person— 1/2005 S. 2(c).

(*a*) convicted of murder in the circumstances specified in subsection (1)(*a*) to (*f*); or

(*b*) to whom section 3(1A) applies,

shall be sentenced in accordance with section 3(1)(*b*).

(3) If in the case of any murder referred to in subsection (1) (not being a murder referred to in paragraph (*e*) of that subsection), two or more persons are convicted of that murder— 1/2005 S. 2(c).

(*a*) the provisions of section 3(1)(*a*) shall apply to any of those persons who—

(i) by his own act caused the death of, or inflicted or attempted to inflict grievous bodily harm on, the person murdered; or

(ii) himself used violence on that person in the course or furtherance of an attack on that person; and



EXT_MITCHELL 000080

(*b*) any other persons convicted of the murder shall be sentenced in accordance with section 3(1)(*b*).

(4) [*Deleted by Act 1 of 2005.*]

(5) In this section—

"correctional officer" has the same meaning as in the Corrections Act;

"judicial officer" means—

(*a*) a Judge of the Supreme Court or the Court of Appeal, the Master in Chambers or any person for the time being performing the functions of a Judge of the Supreme Court or Court of Appeal or of the Master in Chambers;

(*b*) the Registrar or Deputy Registrar of the Supreme Court, the Revenue Court or the Court of Appeal or any person for the time being performing the functions of Registrar or Deputy Registrar;

(*c*) a Resident Magistrate or any person for the time being performing the functions of a Resident Magistrate;

(*d*) a person employed in a court's office who carries out prosecution of offences or in the Office of the Director of Public Prosecutions or engaged to carry out functions on behalf of the Director of Public Prosecutions;

"member of the security forces" means a member of—

(*a*) the Jamaica Constabulary Force;

(*b*) the Jamaica Defence Force to the extent that such member has been assigned to act in aid of the Police;

(*c*) the Island Special Constabulary Force;

(*d*) the Rural Police.

Sentence for murder. 1/2005 S. 3(a)(b).

**3.**—(1) Every person who is convicted of murder falling within—

(*a*) section 2(1)(*a*) to (*f*) or to whom subsection (1A) applies, shall be sentenced to death or to imprisonment for life;

(*b*) section 2(2), shall be sentenced to imprisonment for life or such other term as the court considers appropriate, not being less than fifteen years.

(1A) This subsection applies to a person who is convicted of murder and who, before that conviction, has been convicted in Jamaica— 1/2005 S. 3(b).

(*a*) whether before or after the 14th October, 1992, of another murder done on a different occasion; or

(*b*) of another murder done on the same occasion.

(1B) Where a court pronounces a sentence of death pursuant to subsection (1)(*a*)— 1/2005 S. 3(c).

(*a*) the form of the sentence shall be to the effect only that the person is to "suffer death in the manner authorized by law";

(*b*) every person so sentenced shall, after sentence, be confined to some safe place within the correctional institution, apart from all other inmates; and

(*c*) the sentence may be carried into execution as heretofore has been the practice.

(1C) In the case of a person convicted of murder, the following provisions shall have effect with regard to that person's eligibility for parole, as if those provisions had been substituted for section 6(1) to (4) of the Parole Act— 1/2005 S. 3(c).

(*a*) where a court imposes a sentence of imprisonment for life pursuant to subsection (1)(*a*), the court shall specify a period, being not less than twenty years, which that person should serve before becoming eligible for parole; or

(*b*) where, pursuant to subsection (1)(*b*), a court imposes—

(i) a sentence of imprisonment for life, the court shall specify a period, being not less than fifteen years; or

(ii) any other sentence of imprisonment, the court

shall specify a period, being not less than ten years,

which that person should serve before becoming eligible for parole.

1/2005 S. 3(c). (1D) A person shall not be sentenced to death under this section by reason of a previous conviction for murder referred to in subsection (1A) unless—

(*a*) at least seven days before the trial, notice is given to him that it is intended to prove the previous conviction; and

(*b*) before he is sentenced, his previous conviction for murder is admitted by him or is found to be proven by the trial Judge.

1/2005 S. 3(c). (1E) Before sentencing a person under subsection (1), the court shall hear submissions, representations and evidence, from the prosecution and the defence, in relation to the issue of the sentence to be passed.

Sentence of death not to be passed on pregnant woman. 42/1969 3rd Sch. 1/2005 S. 3(d). (2) Where a woman is convicted of murder falling within section 2(1)(*a*) to (*f*) or to whom subsection (1A) applies is found in accordance with the provisions of this section to be pregnant, the sentence to be passed on her shall be any sentence of imprisonment that may be imposed under subsection (1)(*b*) instead of sentence of death.

Procedure where woman convicted of capital offence alleges she is pregnant. 1/2005 S. 3(e). (3) Where a woman convicted of murder falling within section 2(1)(*a*) to (*f*) or to whom subsection (1A) applies alleges that she is pregnant, or where the court before whom a woman is so convicted thinks fit so to order, the question whether or not the woman is pregnant shall, before sentence is passed on her, be determined by a jury.

(4) Subject to the provisions of this subsection, the said jury shall be the trial jury, that is to say the jury to whom she was given in charge to be tried for the offence, and the members of the jury need not be re-sworn:

Provided that—

# EXHIBIT KP-5



# EXHIBIT KP-6

